IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,    ) Criminal Case No. 19-00036
    )
           Plaintiff,  )
    )
       vs.         )
    )
JESSE MENDIOLA BLAS,    )
    )
_____ Defendant. _)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
CHIEF JUDGE
OCTOBER 29, 2019; 2:02 P.M.
HAGATNA, GUAM

Detention Hearing

Proceedings recorded by *mechanical stenography*, transcript produced by computer.

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910
veronica_flores@gud.uscourts.gov

APPEARANCES


Appearing on behalf of plaintiff:


OFFICE OF THE UNITED STATES ATTORNEY
BY: LAURA C. SAMBATARO, AUSA
108 Hernan Cortez Avenue
Sirena Plaza, Suite 500
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of defendant:


LAW OFFICES OF CIVILLE & TANG
BY: JOSEPH C. RAZZANO, ESQ.
Suite 200
330 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-8868


ALSO PRESENT:

Jesse Blas, Defendant

Jeffrey Ventura, Probation

Connie Worrel, USPIS

Rafael Fernandez, FBI

Leilani Lujan, FPD

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910
veronica_flores@gud.uscourts.gov

Case 1:19-cr-00036   Document 88   Filed 06/03/20   Page 2 of 85

I N D E X

GOVERNMENT
WITNESS:
                   Direct     Cross      Redirect   Recross

Rafael Fernandez   9          18         41         43


EXHIBITS:

            Description                    Admitted

1           Audio recording                13

A           Sealed plea agreement          40

01:53:35PM

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910
veronica_flores@gud.uscourts.gov

```
 1              October 29, 2019; 2:02 p.m.; Hagatna, Guam

 2                            * * *

 3

 4              THE CLERK:  Good afternoon, Your Honor.

 5   This is Criminal Case No. 19-00036, *United States of*

 6   *America versus Jesse Mendiola Blas*, Detention hearing.

 7              Counsel, please state your appearances.

 8              MS. SAMBATARO:  Good afternoon, Your Honor,

 9   Assistant United States Attorney Laura Sambataro on

10   behalf of the government.  To my left are case agents

11   FBI Special Agent Rafael Fernandez and United States

12   Postal Inspector Connie Worrel.

13              THE COURT:  Okay.  Good afternoon, Agent

14   Fernandez and Inspector Worrel and Ms. Sambataro.

15              MR. RAZZANO:  Good afternoon, Your Honor,

16   Joseph Razzano on behalf of Jesse Blas, who's present in

17   the courtroom and seated to my right.

18              THE COURT:  Okay, good afternoon,

19   Mr. Razzano and Mr. Blas.  All right.  Let me just

20   begin, first of all, Counsels, it's my understanding

21   that this is upon motion of the government to have -- to

22   have a detention hearing in a case that involves

23   3142(B); correct?

24              MS. SAMBATARO:  Yes, Your Honor,

25   3142(F)(2)(B); Yes, Your Honor.
```

1          THE COURT:  That's right.  Thank you.

2          MS. SAMBATARO:  Yes.

3          THE COURT:  3142(F)(2)(B) in that this case

4    involves a serious risk that such person will obstruct

5    or attempt to obstruct justice or threaten, injure, or

6    intimidate or attempt to threaten, injure, or intimidate

7    a prospective witness or juror.

8          MS. SAMBATARO:  That is correct, Your Honor.

9          THE COURT:  All right.  So the Court notes

10   that in the particular statute, of course, Mr. Blas or

11   Mayor Blas would be afforded an opportunity to testify

12   and present witnesses, cross-examine witnesses who

13   appear at the hearing, and to present that information

14   by proffer or otherwise, and the Court also notes, as

15   Counsels know, the rules concerning admissibility of

16   evidence in criminal trials do not apply to the

17   presentation in consideration of information at this

18   hearing.

19          So the Court -- the judge, the facts the

20   judicial officer or the judge uses to support a finding

21   pursuant to subsection E, is that no condition or

22   combination of conditions will reasonably assure the

23   safety of any other person and the community shall be

24   supported by clear and convincing evidence, so the

25   burden of proof is clear and convincing evidence.  And

1  then -- so the Court notes that -- and I'm sure you all

2  know, under (G), go to 3142(G), the Court has to

3  consider -- the factors to be considered, the nature and

4  circumstances of the offense charged, including whether

5  the offense is a crime of violence and so forth, the

6  weight of the evidence against the defendant, the

7  history of the characteristics of the person, those are

8  things I'm looking for, and that all judges should be

9  looking for, the person's character, his physical and

10 mental condition, his family ties, employment, financial

11 resources, length of residence in the community,

12 community ties, past conduct, history related to drug or

13 alcohol abuse, criminal history, and records concerning

14 appearance at court proceedings, and whether at the time

15 of the current offense or arrest, the person was on

16 probation or parole or under sentencing, and also the

17 nature and seriousness of the danger to any person or

18 the community that will be posed by a person's release,

19 and so the Court also -- just as we set the parameters

20 here in this hearing, the Court has to consider and it

21 has to state on the record under the United States Code

22 3142(C), release on conditions, the Court has to just

23 consider what are those potential conditions if the

24 Court were to determine that a release would be

25 justified, but the Court has to consider subject to the

least restrictive further -- restrictive further
conditions or combination of conditions, the judicial
officer will determine -- that the judicial officer
determines will reasonably assure the appearance of the
person as required -- and I don't think there's an issue
as a flight risk; is that correct, Ms. Sambataro?

MS. SAMBATARO:  Yes, Your Honor, the
government is not relying on risk of flight.

THE COURT:  And you would agree with that,
too, Mr. Razzano?

MR. RAZZANO:  That's correct, Your Honor.

THE COURT:  So we're looking at what are the
conditions that would reasonably assure the safety of
any other person and the community, and then it has all
these listed conditions.  I don't need to go through
that but those are the conditions that the Court is
required to consider when it holds a detention hearing.
So I just wanted to remind you of the statute, everyone.
All right, you may proceed then.

MS. SAMBATARO:  Okay.

And, Your Honor, the government had
intended, in part, on relying on the transcript from the
prior detention hearing, Agent Fernandez's testimony,
but -- instead of having him testify to those same facts
and then presenting some additional evidence through

1   Agent Fernandez as well.

2           THE COURT:  So all of Agent Fernandez's

3   prior testimony before Judge Manibusan, you just want me

4   to consider those?

5           MS. SAMBATARO:  Yes, Your Honor.

6           THE COURT:  Consider that testimony?  All

7   right.  Very well.

8           MS. SAMBATARO:  Yes, Your Honor.  So -- and

9   in addition to Agent Fernandez's prior testimony, I

10  would like to call Agent Fernandez just to elicit some

11  additional facts regarding some of those issues.

12          THE COURT:  Sure.  Okay.

13          THE CLERK:  Please raise your right hand.

14  You do solemnly swear that the testimony you are about

15  to give in the case now before the Court will be the

16  truth, the whole truth, and nothing but the truth, so

17  help you God?

18          THE WITNESS:  I do.

19          THE CLERK:  Thank you, sir.  Please be

20  seated.  Please state your name and spell your last name

21  for the record.

22          THE WITNESS:  My name is Special Agent

23  Rafael A. Fernandez, F-E-R-N-A-N-D-E-Z.

24          THE CLERK:  Thank you, sir.

25

DIRECT EXAMINATION

BY MS. SAMBATARO:

Q.  Good afternoon, Agent Fernandez.

A.  Good afternoon.

Q.  I want to draw your attention to your testimony in a prior detention hearing in this case.  You referred to an incident that you knew about regarding the defendant, Jesse Blas, involving his assault on a former romantic partner; is that correct?

A.  That is correct.

Q.  Okay.  And if you could describe the information you learned in reference to that assault.

A.  So the information I learned through the assault was that there were -- the mayor, as well as several other folks, were at a barbecue and the individual who provided me with the information said she was assaulted and held against her will.

Q.  Okay.  And who was this individual?

A.  The individual was Vickilyn Teregeyo.

Q.  Okay.  And who did Ms. Teregeyo say assaulted her?

A.  The -- she said it was Mayor Blas and one other individual that assaulted her while she made a statement to them regarding a sexual act.

Q.  Okay.  And that was in reference to the other

1    individual?

2        A.   That's correct.

3        Q.   Okay.  And did Ms. Teregeyo provide you or play a

4    recording for you of her conversation with the defendant

5    regarding that assault?

6        A.   Yes.  So Ms. Teregeyo had mentioned to me that

7    she had a device that was seized, and in the device,

8    there were a number of voicemails that she had recorded,

9    and so we did listen to those recordings.

10       Q.   Okay.  And have you had an opportunity to review

11   one of those recordings pertinent to the assault prior

12   to court today?

13       A.   Yes.

14       Q.   And is it the same recording that Ms. Teregeyo

15   provided to you?

16       A.   That is correct.

17             MS. SAMBATARO:  Your Honor, I move to admit

18   Government's Exhibit 1 for purposes of this hearing.

19             THE COURT:  Okay.  And the defense counsel

20   has heard -- have you heard this -- is it a voicemail?

21   Is it a voice message?

22             THE WITNESS:  It's just a recording on the

23   cell phone.

24             THE COURT:  Okay.  So is it a conversation

25   that she's having?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  With the defendant?

3          THE WITNESS:  That is correct.

4          THE COURT:  Okay.

5          MR. RAZZANO:  So, judge, I did receive an

6    audio recording this morning and it was represented to

7    me that it was a recording, but I thought it was made by

8    the government.  Now, what -- it seems like there's no

9    way to substantiate whether this evidence is actually

10   true and correct because it wasn't made or procured

11   through any government investigation.  This is just

12   something made up by a witness, who is not here to

13   testify and cannot authenticate the actual evidence that

14   they're gonna present.  Now I understand, as you

15   explained earlier, that the rules of evidence do not

16   apply, but at the same time, the reason that we have

17   rules of evidence is to determine that the evidence

18   being proffered or presented is real, and we have no way

19   to identify whether this is real.  Ms. Teregeyo's voice

20   can't be identified by anybody and certainly, Mr. Blas's

21   voice can't be identified, so I don't understand how

22   we're going to actually play this particular recording

23   without really knowing how it was procured and how --

24   and how it was made.  We don't even know how it was

25   made.

```
 1              THE COURT:  All right.  Well, the rules of
 2    evidence do not apply, it's very relaxed, but you're --
 3    are you going to like set up some foundation?
 4              MS. SAMBATARO:  Yes.
 5              THE COURT:  At least some -- okay.
 6              MS. SAMBATARO:  As to voice identification.
 7              THE COURT:  Correct.
 8    BY MS. SAMBATARO: (CONTINUING)
 9       Q.  Agent Fernandez, are you familiar with Ms.
10    Teregeyo's voice?
11       A.  Yes.
12       Q.  You've interviewed her multiple times?
13       A.  That is correct.
14       Q.  Okay.  Add have you heard her voice on this
15    recording?
16       A.  Yes.
17       Q.  And are you familiar with the defendant's voice?
18       A.  That is correct.
19       Q.  Have you interviewed the defendant personally?
20       A.  Yes.
21       Q.  You've heard his voice on other authenticated
22    recordings; correct?
23       A.  Yes.
24       Q.  Okay.  Including in reference to this case;
25    correct?
```

1    A.   That is correct.

2    Q.   Okay.  And is it the defendant's voice on this

3  recording?

4    A.   Yes, it is.

5    Q.   Are there any other voices on this recording?

6    A.   No.

7         MS. SAMBATARO:  Your Honor, I move

8  Government's Exhibit 1 into evidence.

9         THE COURT:  All right.  The Court will allow

10  Exhibit 1 to be brought into evidence for purposes of

11  this detention hearing.

12  (Exhibit 1 admitted)

13         MS. SAMBATARO:  Okay.  May I approach?

14         THE COURT:  Yes.

15         MS. SAMBATARO:  This is just for the record.

16         THE COURT:  Okay.  We're not going to play

17  -- oh, we're going to play it?

18         MS. SAMBATARO:  We're going to play it.

19         THE COURT:  Okay.

20         MR. RAZZANO:  Judge, can we approach?

21         THE COURT:  Sure.

22         (Sidebar.)

23         MR. RAZZANO:  So I guess I'm a little -- I'm

24  a little concerned that we're going to play this audio

25  recording out and, of course, the media is going to go

1  ahead and publish it and it's going to be in the

2  newspaper.  And without really being able to

3  authenticate it, we're basically going to poison the

4  jury pool now.  Before, it was my understanding that Ms.

5  Teregeyo was probably not going to testify in this

6  trial, but then yesterday, we kind of were talking about

7  some 404(b) stuff, so it appears that she might testify

8  in this trial.  So I guess my concern is:  How much of

9  this evidence are we going to allow out into the

10  community, basically, essentially poisoning the jury

11  pool?

12          MS. SAMBATARO:  And Your Honor, with regards

13  to this piece of evidence, it's talking about this

14  assault on her, he's charged with Hobbs Act Extortion,

15  so her 404(b) testimony -- I mean, this recording, would

16  really only be relevant with regard to 404(b) testimony,

17  if she were cross-examined about the reliability of her

18  statements and allegations, specifically with regards to

19  the assaults.  It wouldn't be evidence in the case as

20  currently charged against Mr. Blas.  And Your Honor,

21  this is a detention hearing.  This is relevant,

22  pertinent evidence with regards to the defendant's

23  danger both to Ms. Teregeyo and to the community with

24  regards to his willingness to engage in prior acts of

25  violence.  He also makes statements on the recording to

the tune of talking about his connections with the
courthouse and the power he wields there, which goes to
his willingness to obstruct justice, his dangerousness
to the community and his acts of corruption.

And you know, I'm not thrilled -- I don't
like to try my cases in the media but this is an open-
court proceeding, the government has the evidence it
has, it has a right to put that on, and it is important
for the Court to consider it in making its detention
decision.  The media is here, this is a matter of public
concern.  It is their right to be here.  We can't stop
them, we also shouldn't keep pertinent evidence out of
the detention hearing.  That's -- we can always *voir
dire* potential jurors with regards to their knowledge
about the case and their ability to be fair and
impartial in this case.

THE COURT:  Okay.  And Mr. Razzano?

MR. RAZZANO:  So the evidence --
essentially, I don't dispute what she says, I listened
to it, but we already have that evidence on; the FBI
agent has already testified to it, and we already said
you're going to accept the testimony from the
transcript, so it's just cumulative evidence.  It's
nothing more than to inflame -- basically to inflame the
Court.

```
 1              THE COURT:  Was this tape played at the
 2    magistrate hearing?
 3              MS. SAMBATARO:  It wasn't.
 4              THE COURT:  I'm sorry, the first detention
 5    hearing?
 6              MS. SAMBATARO:  It wasn't.  It was in the
 7    government's possession.  I found it this morning when
 8    going through Ms. Teregeyo's phone downloads from her
 9    case for discovery to turn over to Mr. Razzano.
10              THE COURT:  All right.  So the Court has
11    already indicated that I will consider his -- Agent
12    Fernandez's testimony that was already previously
13    submitted, and because this is new, that's what --
14    you're only bringing him on for additional evidence?
15              MS. SAMBATARO:  Yes.
16              THE COURT:  Correct?
17              MS. SAMBATARO:  Yes.
18              THE COURT:  This is new, the Court will
19    allow you to bring it in.  I mean, I don't see a reason
20    for sealing it, really.  I don't see that there's a -- I
21    understand what you're saying, Mr. Razzano.
22              MR. RAZZANO:  Sure.
23              THE COURT:  And there would have to be, in
24    particular, safeguards at jury selection to try to
25    ensure that the jurors -- potential jurors aren't
```

```
1    inflamed, so because the Court can't find any reason to
2    seal this, I -- I will allow it to be played then.
3                   MS. SAMBATARO:  Okay.
4                   MR. RAZZANO:  Okay.  Thank you, Your Honor.
5                   (End of sidebar.)
6                   MS. SAMBATARO:  Can I confirm with the Court
7    that the audio is on?
8                   THE COURT:  Let me verify.  Yes, I think so.
9                   Is this Exhibit 1?
10                  MS. SAMBATARO:  This is Government's
11   Exhibit 1.
12                  (Pause.)
13                  THE COURT:  Is it plugged in?
14                  MS. SAMBATARO:  It should be.
15                  THE COURT:  You want me to get my IT or are
16   you going -- okay, let's see if Carmen can fix it.
17                  (Pause.)
18                  THE COURT:  It looks like we're getting it.
19                      (Exhibit 1 played.)
20   BY MS. SAMBATARO: (CONTINUING)
21      Q.  Agent Fernandez, do you recognize the male voice
22   on Government's Exhibit 1?
23      A.  Yes, I do.
24      Q.  Whose voice is that?
25      A.  That's Jesse Mendiola Blas.
```

```
 1      Q.  Okay.  And who is the female voice, do you
 2   recognize that voice?
 3      A.  Yes, I do.
 4      Q.  And whose voice is that?
 5      A.  Vickilyn Teregeyo.
 6           MS. SAMBATARO:  Thank you.  Your Honor, I
 7   have nothing further.
 8           THE COURT:  Okay.  Thank you.  Any
 9   cross-examination, Mr. Razzano?
10           MR. RAZZANO:  Yes, Your Honor.
11           THE COURT:  Okay.  You may proceed.
12
13                   CROSS-EXAMINATION
14   BY MR. RAZZANO:
15      Q.  Good afternoon, Agent Fernandez.
16      A.  Good afternoon, attorney.
17      Q.  In your testimony, when you were talking about
18   this particular barbecue, you said there were several
19   other folks there?
20      A.  That is correct.
21      Q.  Now, the last time I asked you about this, about
22   a month ago, you could only name one person who was at
23   that barbecue and it was Joey Terlaje --
24      A.  Yes.
25      Q.  -- in addition to Vickilyn.  Since then, have you
```

```
 1    had an opportunity to review your notes and your case

 2    files in order to prepare for today's hearing?

 3        A.   I have.

 4        Q.   Okay.  And who are the other folks that were at

 5    that barbecue?

 6        A.   So at this time, that's under a continued

 7    investigation.  I can tell you it was at least six

 8    people.

 9        Q.   And are all those people under investigation?

10        A.   That is correct.

11        Q.   You had said that she was, I guess, struck

12    because of -- she was struck by another individual,

13    right?

14        A.   That is correct.

15        Q.   And who was that?

16        A.   She was struck by -- initially by Blas and

17    another individual struck her and drug her into a house.

18        Q.   And who was that?

19        A.   Joey Terlaje.

20        Q.   And you said that she was referencing a sexual

21    act; is that correct?

22        A.   That is correct.

23        Q.   And what was that?

24        A.   So from my recollection, she told us that the

25    reason the fight broke out was because Joey Terlaje
```

1  asked her to introduce him to another female and she

2  said words to the effect of "Well, this female is here

3  with you already and you have a wife at home, do you

4  have another dick?"  And at that point in time, that

5  angered both men and the altercation ensued.

6      Q.  So she was speaking to Mr. Terlaje, not Mr. Blas?

7      A.  That is correct.

8      Q.  Now, the video -- or I'm sorry, the audio

9  recording you just played, you said was on Ms.

10  Teregeyo's phone; is that correct?

11     A.  That is correct.

12     Q.  And what type of phone did she have?

13     A.  I don't recall that at this point.

14     Q.  Can you describe the phone?

15     A.  iPhone.

16     Q.  Okay.  What color was it?

17     A.  (Pause.)  I don't remember.

18     Q.  How do you know it was her phone?

19     A.  She had it in her possession.

20     Q.  Was there any other way that you verified that

21  that phone belonged to her and that that telephone

22  number belonged to her?

23     A.  Yes.

24     Q.  Okay.  And how did you do that?

25     A.  Through telephone analysis.

1      Q.   And what was her telephone number?

2      A.   I don't remember that right now.

3      Q.   This telephone analysis, what did you do?

4      A.   So the phone was actually seized by another

5   agency.  They maintained custody of the phone and we did

6   receive the phone -- the FBI received the phone and we

7   conducted a telephone analysis.

8      Q.   What type of application was used to create the

9   recording?

10     A.   I don't remember.  I believe it was just a

11  recording on the regular phone recorder.

12     Q.   What was the date of the recording?

13     A.   I don't remember that.

14     Q.   (Pause.)  Did you interview Ms. Teregeyo about

15  this particular recording?

16     A.   Yes.  She mentioned that she had a number of

17  recordings on her phone, this was just one of 'em.

18     Q.   Had you ever sat and listened to it with her?

19     A.   No, not with her.

20     Q.   Who actually discovered it, which agency?

21     A.   The agency that initially discovered it was the

22  Drug Enforcement Administration.

23     Q.   Now, Ms. Teregeyo, is she cooperating with the

24  United States?

25     A.   Yes, she is.

Q.  And what is her -- what was her charge, what did she plead guilty to?

A.  She pled guilty to a firearms violation.

Q.  Now, when you interviewed Vickilyn about the night of the assault, did she tell you that she was drunk?

A.  I don't remember if we got into whether or not she'd been drinking.  I think she may have mentioned she had a few drinks, yes.

Q.  Did she tell you that she was attempting to get somebody's car keys in order to drive away from the house, drunk, did she tell you that?

A.  No, I don't believe she did.

Q.  Okay.  And did you ask her if, in fact, she was planning on driving that evening?

A.  No.

Q.  Did she tell you that Mr. Blas was her third-party custodian for another case, did she tell you that?

A.  Yes, she did.

Q.  And so then you knew that she could not leave the premises as part of her conditions of release; is that correct?

A.  Well, at this point in time, Ms. Teregeyo also told me she was involved in --

1    Q.  Well, why don't you answer my question, okay?

2    A.  Sure.  Go ahead.

3    Q.  Okay.  So my question was did she tell you that

4 she could not leave the home as a condition of her

5 release?

6    A.  She showed up to the home without him.

7    Q.  Okay.  So she was in violation of her --

8    A.  Absolutely.

9    Q.  And drinking would be another condition --

10    A.  Absolutely.

11    Q.  -- in violation of her release?  So Ms. Teregeyo

12 is not really a reliable person?  I mean, she violates

13 Court orders; is that correct?

14    A.  With the assistance of individuals who provided

15 -- in violation of orders, yes.

16    Q.  Well, what do you think about people who violate

17 Court orders, as an FBI agent?

18          MS. SAMBATARO:  Objection.

19          THE WITNESS:  I think that they're wrong,

20 they shouldn't violate orders.

21          THE COURT:  I'm sorry.  I'm sorry, wait.

22 What does he think about who violate -- the objection

23 is?  What's the objection?

24          MS. SAMBATARO:  I mean, Your Honor, there's

25 relevant speculation.  I mean, it doesn't matter -- what

matters are the facts and the evidence and then we get

to argue.

THE COURT:  What is the relevance of what he

thinks about people --

MR. RAZZANO:  Well, I think it directly goes

to the credibility of Ms. Teregeyo, who by the way, is

not here to testify about any of this.  It's nothing

more than the hearsay statements of a person who

violates Court orders, how reliable is that?

THE COURT:  Well, you can argue that part on

her credibility and her lack of credibility or --

MR. RAZZANO:  That's why we're developing

the evidence.

THE COURT:  All right.  But -- I will

overrule the objection as far as that issue, go ahead.

So you remember the --

THE WITNESS:  For the record, absolutely I

think she was wrong in violating her Court orders.

BY MR. RAZZANO: (CONTINUING)

   Q.   Did she tell you why she made the recording that

was played in court?

   A.   She did.

   Q.   And what did she tell you?

   A.   She told me because no one would ever believe her

story without the recording.

Q.   (Pause. )   Now, did Vickilyn tell you that Mayor
Blas had to be interviewed and had to go to probation in
order to qualify as her third-party custodian?

A.   No, she did not tell me that.

Q.   And while you may characterize the audiotape in
one way, certainly he's telling her that she needs to
comply with her Court orders; is that not correct?

A.   That is correct.

Q.   So he's -- he's trying to help her, he's saying
to her "if you don't follow the rules of the Court, if
you take the easy way out, if you don't come home and
comply with your third-party custodian orders, you're
gonna go back to jail;" is that correct?

A.   That could be an interpretation.

Q.   Okay.   So he's helping her, he's trying to help
her get on the better path and comply with her orders to
be a better person; isn't that correct?

A.   No, that's not correct.

Q.   Did you prepare a 302 report with respect to your
interview of Ms. Teregeyo?

A.   Yes, I did.

Q.   Okay.   And do you know if it's been provided to
me?

A.   So there's a DEA-6 that was conducted with her
initial interview, there's a full recording of her

1    initial interview that I did.

2        Q.  I'm sorry.  Was that only a partial recording?

3        A.  No, my interview of her, there's a full

4    recording.

5        Q.  So what was played in court was not the full

6    recording; is that correct?

7        A.  No, that's not an interview of her, that's just a

8    recording she had on her phone.

9        Q.  Okay.  I'm sorry.  So you're talking about the

10   DEA-6?

11       A.  That's correct.

12       Q.  Well, let me go back though so I understand.

13   What we just heard was the full phone recording or a

14   portion of it?

15       A.  What you heard is one of the recordings that she

16   had on her phone.

17       Q.  But the whole thing?

18       A.  But the whole thing, that's correct.

19       Q.  Okay.  Now going back to the recorded stuff.

20       A.  Yes, so I -- that's been turned over.  I don't

21   know if you had an opportunity to review it but there is

22   a recorded interview of her when she brings up these

23   things to me for the first time.

24            MR. RAZZANO:  Your Honor, I have one exhibit

25   with respect to the last hearing we had regarding the

```
1    other individual, who they allege was threatened by a
2    police officer, and I know it's under seal so I want to
3    present the evidence and then discuss it a little with
4    the FBI agent without really revealing too much.  So can
5    I admit --
6              THE COURT:  Is it a document or --
7              MR. RAZZANO:  It is.  It's a plea agreement.
8              MS. SAMBATARO:  It's a sealed plea
9    agreement, Your Honor.
10             THE COURT:  Okay.  Let me see if I got the
11   sealed -- I'll pull up the sealed plea agreement brought
12   up for me.  Do you guys have an extra copy while we wait
13   for ours?
14             MR. RAZZANO:  I do.  I have two.
15             THE COURT:  Oh, good.
16             MR. RAZZANO:  May I approach, Your Honor?
17             THE COURT:  Okay.  Yes.
18             MR. RAZZANO:  But I will need an extra one
19   for the witness.
20             THE COURT:  Oh, okay.  Well, you could take
21   it back.
22             MR. RAZZANO:  Take that one?
23             THE COURT:  Yeah, they're going to bring --
24   you want me to give it to the witness?
25                  (Discussion with clerk.)
```

```
 1                    THE COURT:  I can have this, Mr. Razzano?
 2                    MR. RAZZANO:  Yes.
 3                    THE COURT:  And you'll have it back --
 4                    MR. RAZZANO:  No, I mean, you can keep that
 5      one.  The witness will -- I'll admit this one into
 6      evidence and withdraw the -- which I'll represent to you
 7      this is Government's JMB-109 through 121.
 8                    THE COURT:  Do you have yours with you, Ms.
 9      Sambataro?
10                    MS. SAMBATARO:  Yes.
11                    THE COURT:  If you don't -- okay.  Very
12      well.  If not, I can give you this and I'll get the
13      original but go ahead.
14      BY MR. RAZZANO:  (Continuing)
15         Q.  Agent Fernandez, you've been handed what's going
16      to be marked as Defendant's 1 or Defendant's A.  Do you
17      recognize these documents?
18         A.  I do.
19         Q.  Okay.  And are you one of the agents who worked
20      with Brenda in this investigation?
21         A.  Yes.
22         Q.  And are you familiar with her charges?
23         A.  I am.
24         Q.  Now, last hearing, we represented to the Court
25      that one of the charges that was pled guilty to
```

1   consisted of lying; is that correct?

2     A.  I'm sorry, say that again.

3     Q.  Do you recall one of her charges -- at least I

4   represented to the Court that she was basically

5   convicted of lying; is that correct?

6     A.  I haven't reviewed her actual plea -- I mean, I

7   think she pled to extortion... (Reading document.)  I'm

8   not sure -- can you show me --

9     Q.  Sure.  If you look at JMB-000114, line 9, and I

10   don't want you to read any of the --

11     A.  Right.

12     Q.  I don't want you to read the names and I don't

13   want you to read -- I just want you to know, can you

14   identify the word "lie"?

15            MS. SAMBATARO:  Your Honor, may we approach?

16            THE COURT:  Okay, you may.

17            (Sidebar.)

18            (Lani Lujan present at sidebar.)

19            (Pause.)

20            THE COURT:  This is like a factual basis,

21   right?

22            MS. SAMBATARO:  Yes.

23            THE COURT:  I'm just looking at this, this

24   is like factual basis?

25            MR. RAZZANO:  That's correct.

1          MS. SAMBATARO:  And the concern is this is a

2    sealed plea agreement and by bringing it into court

3    proceeding in this matter, Mr. Razzano is essentially

4    unsealing it, which is why Ms. Lujan --

5          THE COURT:  You're her Counsel?

6          MS. LUJAN:  I'm making my special

7    appearance.  Yes, Your Honor, I am counsel and I'm

8    making my special appearance to enter an objection to

9    unsealing Ms. Kinian's case.

10          MR. RAZZANO:  I'm not trying to unseal it.

11    I'm trying to get the FBI agent to admit that what she

12    did was lie.  She lied then, she is more than likely

13    lying now.  And in fact, again, I know the rules of

14    evidence don't apply, but there has to be some

15    protection for the defendant.  These are the unsworn

16    hearsay statements of a known liar to the United States

17    and to this Court, and her credibility is definitely at

18    issue.

19          THE COURT:  All right.  Well, first of all

20    -- okay, so this is a sealed document; is that right?

21          MS. SAMBATARO:  Yes.

22          MS. LUJAN:  Yes, and it's a sealed case

23    still.

24          THE COURT:  Oh, the whole case is sealed?

25          MS. SAMBATARO:  Yes.

```
 1                    THE COURT:  It's not just --
 2                    MS. SAMBATARO:  The Department of Justice
 3    signed off on the sealing.
 4                    THE COURT:  Oh.
 5                    MS. LUJAN:  And may I just make another
 6    objection for the record?  This document has been handed
 7    to the agent who is the case agent in Ms. Kinian's
 8    sealed case.
 9                    THE COURT:  Right.
10                    MS. LUJAN:  But this document is being
11    projected onto the television and can be seen by the
12    public.
13                    THE COURT:  It's not being on the
14    television.
15                    MS. LUJAN:  It is being projected in the
16    witness's hands while the witness is testifying.
17                    THE COURT:  Is it?
18                     (Discussion with law clerk.)
19                    THE COURT:  Oh, I thought you meant like --
20    it's not being presented.
21                    MR. RAZZANO:  You can turn the cameras off
22    in the court, that's fine.
23                    MS. LUJAN:  Okay.  But also, I'm going to
24    enter an objection for Ms. Kinian that this line of
25    questioning and entire direct examination is, in effect,
```

1    unsealing her case.

2              THE COURT:  Go ahead.

3              MR. RAZZANO:  The government shouldn't put

4    the witnesses on the stand if they don't want to affect

5    their cases.

6              THE COURT:  No, no, but I -- just

7    backtracking.  So there's no question that the

8    credibility of a witness is always at issue.  We got

9    that.  But because Ms. Lujan makes a point that this is

10   a sealed plea agreement, it has not been unsealed for

11   any purpose, as of right now, and that perhaps, maybe

12   taking the testimony -- we can either clear the

13   courtroom to have him testify, keep this under seal, so

14   that we can protect the sealing or we can just have the

15   witness come over here at the bench and -- because do

16   you have any much more --

17             MR. RAZZANO:  No.

18             THE COURT:  -- to say?

19             MR. RAZZANO:  The only other thing I want to

20   go through with him is that this band of criminals, this

21   gang that she runs with to steal these people's money,

22   that's who she's in danger of.  That is the truth of the

23   matter.

24             THE COURT:  You can ask that generally,

25   without going into the plea agreement because this is

the factual basis of the plea agreement, it's under

seal.

MR. RAZZANO:  I just want him to say that

she lied.

THE COURT:  Okay.  Hold on a second.  I'm

just looking at line 9 and why they were protecting her.

It says -- okay, she lied on line 9.  And that's the

only part you're going to talk about?

MR. RAZZANO:  That's all I want.  I just

want him to admit that she's a liar, that's all.  In

fact, the government can stipulate that she's a liar.

MS. SAMBATARO:  I'm not going to stipulate

that she's a liar for all purposes.  I'm sure you've

lied at some points in your life.  Everybody lies.

MR. RAZZANO:  My credibility is not at

issue.  Maybe the stipulation could be that in the

factual basis she does say -- she does agree that she

and others routinely telephoned the aunts and lied that

they were protecting A. Market, that's what it says

here.

MS. SAMBATARO:  And I think that's properly

before the Court and the Court can properly consider

that without the plea agreement being unsealed in open

court.

THE COURT:  I agree.

```
 1              MS. SAMBATARO:  And I think this whole line
 2     of cross-examination --
 3              THE COURT:  Yeah, but -- but --
 4              MR. RAZZANO:  I'm sensitive to what they're
 5     doing, I'm not trying to hurt -- I don't want to hurt
 6     this woman and I don't want to hurt the government's
 7     case.
 8              THE COURT:  All right.  It hasn't been
 9     unsealed but the fact is, is that the road you're going
10     is effectively going towards unsealing, we don't want to
11     do that.  So you can -- you guys -- you want to just
12     stipulate that she made a factual basis or she made a
13     statement and you don't even have to identify the
14     document.
15              MR. RAZZANO:  Okay.
16              THE COURT:  Okay?
17              MS. SAMBATARO:  The plea agreement -- in her
18     plea agreement, her crime involved an element of making
19     a false statement.
20              THE COURT:  Okay.
21              MR. RAZZANO:  About lying, lying.
22              MS. SAMBATARO:  So the Court gets to see it
23     but you're trying to unseal it in front of the
24     courtroom, which the government objects to, and I think
25     you can make that argument without -- essentially, he's
```

also -- with the whole line of cross-examination, it's
almost -- it's not a cross, it's an argument.  It's
making legal conclusions instead of eliciting facts at
this point.

THE COURT:  Yeah.  Okay.  What exactly do
you want?  You just want this guy to say what, that
she's admitted to lying, that's all?

MR. RAZZANO:  Right, and that she's in
danger from her cohorts in this case, that's why this
case is sealed.  And I don't doubt that she is in danger
from those people.

MS. SAMBATARO:  This case was sealed, in
part, because of her cooperation with the government as
well in this case.

MS. LUJAN:  If I may make a suggestion?
Perhaps the parties here can place their stipulation on
the record and then in open court can just refer to what
generally is the stipulation.

THE COURT:  Yeah, that's what I just was --
either you guys get him to come up here, if you want to
question him here, and I'll seal this part of the
proceeding because this is under seal or you can
stipulate.

MS. SAMBATARO:  I'm fine with stipulating
that this is what her plea agreement says.

```
 1            MR. RAZZANO:  As long as the Court accepts
 2    that she lied, I'm fine with that.
 3            THE COURT:  Okay, well, specifically, just
 4    that line, I'm just going to focus on that line.
 5            MR. RAZZANO:  Correct.
 6            THE COURT:  Line 9?
 7            MR. RAZZANO:  Line 9.
 8            THE COURT:  Okay.  That her factual basis
 9    that she telephoned the aunts and lied that they were
10    protecting A. Market.
11            MR. RAZZANO:  Correct.  And that she is in
12    danger from her co-defendants in this case.
13            MS. SAMBATARO:  I wouldn't -- I think that's
14    your argument but we don't have evidence of that.
15            MR. RAZZANO:  Well, then I want to ask him
16    about that.
17            MS. SAMBATARO:  You can ask him about why
18    she was relocated, I'm totally happy -- I'm fine -- are
19    you fine with that?
20            MR. RAZZANO:  I want to know why this was
21    sealed.
22            THE COURT:  I'm sorry.  Okay.  So we got the
23    lied part.  The Court will take notice of this
24    particular stipulation that the factual basis is
25    contained within the sealed plea agreement.  What's the
```

```
1    second issue?
2              MR. RAZZANO:  So I don't know when her
3    indictment was, but you know, the plea agreement is
4    signed on September 26th, 2018.  This is before she's
5    even working on Mr. Blas's case.  The reason this case
6    is sealed is because she is in danger from these people.
7              MS. SAMBATARO:  No.
8              MR. RAZZANO:  Okay, then what is the counter
9    proffer?
10             MS. SAMBATARO:  This case was --
11             MS. LUJAN:  Well, first of all, Your Honor,
12   the statement, you know, that Mr. Razzano wants further
13   stipulation to, I would submit to you is completely
14   irrelevant to the sealing.  The sealing occurred because
15   of cooperation, strictly that.
16             THE COURT:  Okay.
17             MS. LUJAN:  Her identity at the time of the
18   plea was not publicized and so there was -- she was in a
19   position where she could render very valuable assistance
20   without any targets being aware.
21             THE COURT:  Okay.  But what is it that --
22             MR. RAZZANO:  I have one more question,
23   that's because these individuals were targets?
24             MS. LUJAN:  No.  I would submit to Your
25   Honor that, first of all, I can't answer that question,
```

1  but more importantly, she -- if I could just state

2  generally, she's not in danger by these targets.

3           MR. RAZZANO:  Okay.  Are any of the people

4  that she did this crime with, the targets of any

5  investigation?

6           MS. SAMBATARO:  I can't speak to that.

7           MR. RAZZANO:  Okay.

8           THE COURT:  So what else -- is there

9  anything else you want to get out?

10          MR. RAZZANO:  No.

11          THE COURT:  So I can just return the plea

12 agreement -- I'll just have the agent return the plea

13 agreement, we won't discuss this further.  The only way

14 we'll discuss it is either under a sealed situation or I

15 exclude everybody out of the courtroom, if it's

16 necessary, or bring him up here; that's it or you

17 stipulate.  So you already stipulated to this particular

18 part of the lie, anything else?

19          MR. RAZZANO:  No.

20          THE COURT:  Okay.

21          MS. LUJAN:  If I may just make one more

22 objection.  Officer or Agent Rafael Fernandez did state

23 the charge to which Ms. Kinian pled and there's no

24 unringing the bell.  That was -- that statement was made

25 in open court.

```
 1                THE COURT:  I think he was looking for the
 2    charge.  He was trying --
 3                MR. RAZZANO:  No, I asked him --
 4                THE COURT:  He asked him if he was charged
 5    with lying.
 6                MR. RAZZANO:  With Vickilyn Teregeyo and he
 7    did say --
 8                MS. LUJAN:  No, he said that she pled to
 9    extortion.
10                THE COURT:  Oh, that's right.  I think he
11    was looking for the word "lying" I guess --
12                MS. LUJAN:  Right.
13                THE COURT:  The agent was.
14                MS. LUJAN:  There's no unringing the bell on
15    that, but still to protect the sealing of Ms. Kinian's
16    case, I would ask that portion of the record also be
17    sealed.  When -- what she pled to.
18                THE COURT:  Okay.  The Court will --
19                MR. RAZZANO:  No objection.
20                THE COURT:  The Court will make sure that
21    portion -- that question and answer -- how about
22    anything -- why don't we do this, now -- I mean, the
23    bell has been unrung a little here but anything with
24    regard to the sealed plea agreement, question and
25    answer, be sealed.
```

```
 1                 MS. LUJAN:  Yes.

 2                 MS. SAMBATARO:  Yes.

 3                 THE COURT:  The Court will consider -- I

 4    will say based on Defendant's Exhibit A, the Court has

 5    taken into consideration whatever testimony that has

 6    occurred and also the stipulation regarding the factual

 7    basis.

 8                 MR. RAZZANO:  (Nodded head.)

 9                 THE COURT:  Okay.

10                 MS. LUJAN:  Yes.

11                 MR. RAZZANO:  That's fine.

12                 MS. LUJAN:  Thank you.

13                 (End of sidebar.)

14                 MR. RAZZANO:  Your Honor, just so the record

15    is clear, I move to admit into evidence Plaintiff's 1.

16                 THE COURT:  A, you mean?

17                 MR. RAZZANO:  Sorry, Defendant's A, yes.

18                 THE COURT:  All right.  Very well.

19                 MR. RAZZANO:  I have no further questions.

20                 THE COURT:  Exhibit A admitted.

21    (Exhibit A admitted.)

22                 THE COURT:  Any redirect?

23                 MS. SAMBATARO:  Just briefly, Your Honor.

24                 THE COURT:  Yes, go ahead.

25
```

                    REDIRECT EXAMINATION

BY MS. SAMBATARO:

    Q.   Agent Fernandez, with regards to the source, you
work with Brenda?

    A.   Yes.

    Q.   When you sent her on operations regarding the
defendant, did she wear a wire?

    A.   Yes.

    Q.   And those operations that were initiated by the
FBI were all recorded; correct?

    A.   That is correct.

    Q.   Okay.  Now, going to Ms. Teregeyo, did Ms.
Teregeyo tell -- what did Ms. Teregeyo tell you about
what the defendant had to do to become her third-party
custodian?

    A.   So Ms. Teregeyo told me that she didn't know the
defendant or Mr. Blas at all.  She was told by another
female that she should call him, so she did, and the
first time she met him was during the hearing.

    Q.   Well --

    A.   And what she had mentioned to me was that she was
referred and -- because he would help her with the
proceedings.

    Q.   Okay.  And did she tell you whether or not he had
to be interviewed by probation or approved by the Court?

          1        A.   She did not mention any of that to me.

          2        Q.   Okay.  And what did Ms. Teregeyo tell you about

          3   her compliance with her court orders?

          4        A.   Essentially, what she told me was as long as she

          5   kept having sex with the defendant, that the compliance

          6   would be good and she wouldn't necessarily be tested for

          7   drugs or have warrants issued.

          8        Q.   Okay.  Thank you.

          9             MS. SAMBATARO:  I have nothing further, Your

         10   Honor.

         11             MR. RAZZANO:  May I, Your Honor?

         12             THE COURT:  So she said warrants wouldn't be

         13   issued by the probation officers or the pretrial

         14   officers?

         15             THE WITNESS:  Well, the marshals.

         16             THE COURT:  Oh, the marshals?

         17             THE WITNESS:  Well, warrants wouldn't be

         18   acted upon.

         19             THE COURT:  Was she talking about the local

         20   court or federal court?

         21             THE WITNESS:  Yes, the local court.

         22             THE COURT:  The local court?

         23             THE WITNESS:  (Nodded head.)

         24             THE COURT:  Okay.  Okay.  Yes, go ahead, Mr.

         25   Razzano.

                    RECROSS-EXAMINATION
BY MR. RAZZANO:

    Q.   Did she tell you where she got that information?

    A.   What information?

    Q.   The information about as long as she kept having
sex with the defendant, that other officers were not
going to issue her warrants or that she would be good?

    A.   She received the information from another female
and she also received that information from the mayor
himself.

    Q.   Who was the other female?

            MS. SAMBATARO:  Objection, Your Honor.
That's part of -- that's something at this point the
government would like to keep confidential, that's part
of our ongoing investigation.

            THE COURT:  All right.  The Court will grant
that request then.

BY MR. RAZZANO: (CONTINUING)

    Q.   Ms. Teregeyo, if you recall, she is no longer
living on Guam; is that correct?

    A.   That is correct.

    Q.   And she lives in Saipan?

    A.   That is correct.

    Q.   And she lives with her parents?

    A.   Um, she -- yes.

```
 1      Q.   Okay.  She works for her father?
 2      A.   That is correct.
 3      Q.   Okay.  And if Mr. Blas is not to be allowed to
 4   leave his home or use the internet or contact her, is
 5   she in any danger?
 6      A.   I don't know how to answer that question, I'm not
 7   -- if --
 8      Q.   Well, in your opinion, is she in any danger?
 9      A.   I think she's in some danger now.
10      Q.   Okay.  And with respect to Brenda, the government
11   told us in their brief that she no longer is on-island?
12      A.   That is correct.  That is correct.
13      Q.   And I don't want to know where she is but I
14   understand she's under protection of law enforcement; is
15   that correct?
16      A.   That is correct.
17      Q.   Is she in any danger?
18      A.   I wouldn't believe that she is in any danger at
19   this point.
20            THE COURT:  You don't believe she's in --
21            THE WITNESS:  I don't believe she's in
22   danger.
23   BY MR. RAZZANO: (CONTINUING)
24      Q.   If you think Ms. Teregeyo is in some danger, why
25   doesn't law enforcement take steps to remediate that?
```

1    A.   So we've had discussions with Ms. Teregeyo about

2    that, she is -- she was essentially the cooperator that

3    we used to collect evidence, and she's chosen to stay in

4    Saipan.

5    Q.   So she doesn't feel that she's in any danger?

6    A.   Well, she mentioned to me that her life is in

7    Saipan, she's got kids in Saipan and -- however, she

8    does feel as if something could happen to her in Saipan.

9    Q.   Could in the future?

10   A.   At some point, yes.

11   Q.   When did she tell you that?

12   A.   She told me that shortly after the arrest of the

13   mayor, I had a conversation with her and, again, we

14   offered her to spend some time outside of Saipan and she

15   said that she'd prefer to stay, even though she felt

16   that she could potentially be in danger but I remained

17   in contact with her about that as well.

18               MR. RAZZANO:  I have no further questions,

19   judge.

20               THE COURT:  Ms. Sambataro, anything further

21   with the witness?

22               MS. SAMBATARO:  No, Your Honor.

23               THE COURT:  Okay.  You may step down, sir.

24   Any further witnesses?

25               MS. SAMBATARO:  None from the government,

1    Your Honor.

2              THE COURT:  Okay.  Defense?

3              MR. RAZZANO:  No, Your Honor.

4              THE COURT:  Okay.  Well, I guess I'll hear

5    arguments then, Counsels.

6              MS. SAMBATARO:  Your Honor, we're here today

7    for the Court to consider whether there are any

8    conditions or combination of conditions that can

9    reasonably alleviate the danger to the community posed

10   by the defendant.  The government would allege that

11   there are none.  Going through the 3142(G) factors, the

12   nature and circumstances of the offense charged, Your

13   Honor, this is an extortion offense.  While this is not

14   a crime of violence, it's not one of the listed offenses

15   under (G)(1), this is a serious offense in that it does

16   involve a public official abusing his public office and

17   using his public office to his own benefit.  He's

18   supposed to be providing a service to the citizens of

19   Yona and instead he is selling mailboxes for his own

20   profit.

21             The allegations in here were that he was

22   taking bribes for selling mailboxes to people he

23   believed were drug traffickers, and the Court can refer

24   to the transcript from the last hearing, this

25   investigation was based on information that law

enforcement had received that he was providing mailboxes
to drug traffickers to receive methamphetamine.  And so
he was taking a service meant for village residents and
he was using it for his own benefit and he was using it
to further harm the community by providing a vessel
through which people could bring drugs onto this island.
So that's the nature and circumstances of this offense,
Your Honor.  It's a serious offense and the harm to the
community caused by this individual's abuse of his
position of public trust.

Now, going to the weight of the evidence.  I
did have Agent Fernandez testify that when the bribes
were paid, they were recorded.  They're all on
videotape, the defendant is on tape, taking money in
exchange for providing a cluster box, which is supposed
to be a free service for village residents.  And the
case law does say that it is the -- in terms of the
weight of the evidence, that is -- the Court accords the
least weight to that factor but that is a factor to be
taken into consideration, under (G)(3), the history and
characteristics of the person.  And Your Honor, that
includes past conduct.  And while the defendant does not
have prior criminal history, we do have testimony -- we
have a very serious recording, it doesn't matter if the
defendant was Ms. Teregeyo's third-party custodian and

in a relationship with her, he admits to hitting her, to

choking her, he admits to physically assaulting her, and

then it's not like he's trying to help her, he's telling

her about the power he has at the courthouse and the

power he has over her. This is a -- this is a domestic

violence relationship with someone using their power to

control another individual and that should be taken into

consideration by the Court, both with regards to his

danger towards Ms. Teregeyo, but also towards the

community. This is someone who has been willing to

engage in violent acts in the past -- and the Court's

brief indulgence. This is someone who's willing to

engage in violent acts in the past and in -- I believe

it was the 11th Circuit, *United States versus*

*Quartermaine*, said that acts of domestic violence are

considerations when determining whether someone is a

danger to the community, the cite to this is 913 F2d

910. And the 11th Circuit said in that case, "a

willingness to strike loved ones offers probative

evidence of a tendency to violence and dangerousness

towards others." And Your Honor, this is a case you --

it's not just Ms. Teregeyo's words, in the defendant's

own words he admits to hitting her, he admits to choking

her. And then he threatens her by pointing out the

power he has over a Court that has a position of

```
1    authority over her.  And that goes to the nature and --
2    under 3142(G)(4), the nature and seriousness of the
3    danger to any person or the community that would be
4    posed by the person's release.
5            Your Honor, just because Ms. Teregeyo is in
6    Saipan doesn't mean that she's unreachable.  Especially
7    with social media, with technology these days, no one is
8    unreachable, even if they're not reachable in person or
9    even directly, they're always reachable via third-party,
10   they're always reachable via social media, and when it
11   comes down to potential conditions of release, Your
12   Honor, the government's concern is, first of all, if the
13   defendant's released and he has access to the mayor's
14   office, he used that --
15           THE COURT:  Before we get into the
16   conditions of release, on the continued factors to be
17   considered, so you've gone through, number one and
18   number two, the weight.  Then you're talking -- you said
19   he has no prior criminal history but you're asking the
20   Court to consider his -- his history and characteristics
21   as it relates to Exhibit 1 --
22           MS. SAMBATARO:  Yes, Your Honor.
23           THE COURT: -- right?
24           MS. SAMBATARO:  And actually, the defendant
25   does have prior criminal history, he has a conviction
```

1    from a local charge for harassment.

2              THE COURT:  Okay, so you -- you want me to

3    consider that.  And that's noted in the prior detention

4    hearing?

5              MS. SAMBATARO:  It's noted -- and Your

6    Honor, I will correct myself, I did say that that

7    conviction for harassment was domestic but I

8    subsequently did learn it does not appear to have been

9    domestic, he does have a prior conviction for harassment

10   though.

11             THE COURT:  Like petty misdemeanor

12   harassment under the violation, correct, under the local

13   statute?

14             MS. SAMBATARO:  Yes, Your Honor, that's my

15   understanding of the conviction, and I'm not as versed

16   in local law.

17             THE COURT:  Okay.

18             MS. SAMBATARO:  And so he does have that

19   prior conviction but, also, just his prior conduct,

20   Government's Exhibit 1, his admission to a very serious

21   violent act on someone that was in a intimate

22   relationship with him.

23             THE COURT:  What about the other factors

24   that they're talking about?  His character, his family

25   ties -- I mean, you've talked about his employment as a

1    public official, you've gone through that.

2                    MS. SAMBATARO:  Yes, Your Honor.  And --

3                    THE COURT:  What about these other matters

4    the Court has to consider?

5                    MS. SAMBATARO:  Yes, Your Honor, and the

6    defendant does have family ties and ties to the

7    community, Your Honor, and that definitely goes towards

8    -- that is a part of the Court's consideration, but the

9    government would contend though is that in spite of

10   those ties to the community, in spite of those family

11   ties, he engaged in an abusive office, he engaged in

12   assaultive acts and he really -- people can behave in

13   different manners in the different context that they're

14   in and someone can be a wonderful family member, father,

15   in one context and be an abusive boyfriend in another,

16   be a corrupt public official in another.  And so while

17   he does have those factors here, it doesn't mitigate the

18   behavior he engaged in and the harms he has caused in

19   the past and the government's concern is that if

20   released, he would continue to engage in those harms.

21                   THE COURT:  What about employment?

22                   MS. SAMBATARO:  Well, Your Honor, when we

23   look at the defendant's employment history, he's the

24   mayor of Yona and he used that position to commit his

25   crimes.

1           THE COURT:  Okay.  You said that -- so

2    you're talking about the -- okay, so in terms of the

3    nature and circumstance of the offense, you talked about

4    that.

5           MS. SAMBATARO:  Yes, but even when looking

6    at the employment --

7           THE COURT:  Uh-huh.  If he were to continue

8    to be employed, how would that affect your belief about

9    the conditions of release?

10          MS. SAMBATARO:  Well, Your Honor, the

11   government's concern is that if he continued in his

12   position as the mayor of Yona, he might have access to

13   potential witnesses as we do have an ongoing

14   investigation into his activities as the mayor of Yona.

15   It's a position of power, he'll be able to continue to

16   wield that power.

17          THE COURT:  I have -- in the indictment, in

18   particular, on paragraph 9.

19          MS. SAMBATARO:  Yes.

20          THE COURT:  It says, "Defendant offered to

21   sell the second mailboxes in Yona, CD used it, Brenda

22   and her purported drug trafficking co-conspirators," so

23   am I to assume that those purported drug trafficking

24   co-conspirators are still out in the community?

25          MS. SAMBATARO:  Well, Your Honor, it was

phrased that way because Brenda was posing as a drug trafficker. And that was based on information that that was the activity he was engaging in. And we are working to identify... we are engaging in an ongoing investigation, Your Honor.

THE COURT: Well, I was just trying to --

MS. SAMBATARO: Yes.

THE COURT: As I read the indictment, does that -- in terms of a danger to the community, does that particular sentence represent that danger to the community?

MS. SAMBATARO: Your Honor, with regards to Brenda and his activities with her, no, because she was posing as a drug trafficker. But with regards to the fact that that, essentially, sting operation was designed based on information that that was the defendant's *modus operandi*, yes, the government does consider that a danger to the community.

THE COURT: Okay. Anything else with regard to number three?

MS. SAMBATARO: No, Your Honor.

THE COURT: Okay, let's see. Okay. So now you're going to go into conditions, right, that's what you're going to go into?

MS. SAMBATARO: Yes, Your Honor.

1           THE COURT:  You can talk to me about that.

2           MS. SAMBATARO:  Yes, Your Honor.  So, again,

3    as the government stated previously, we are concerned

4    that if the defendant is released, he would have access

5    to the mayor's office, he would have access to the means

6    and instrumentalities through which he committed his

7    past crimes.  And it's the government's contention that

8    home detention would also not be an acceptable

9    alternative in that we have evidence that this is

10   someone who in the past made statements about the level

11   of power he had at the local courthouse.  He -- we have

12   video of him taking bribes very openly in the mayor's

13   office.  This is someone who doesn't fear consequences,

14   the brazenness in which he acted, and so we don't have

15   faith that even if he were restricted to home detention

16   that he would be compliant with those conditions in a

17   way that would protect the government's ongoing

18   investigation and also protect the integrity of the

19   government's case as charged.

20          THE COURT:  Okay.  So you said access to the

21   mayor's office and his means that he would use to

22   facilitate the crime.  What other means are you talking

23   about, besides his connection to the Court?  Court -- I

24   would assume that's Court marshals?

25          MS. SAMBATARO:  Yes, Your Honor.

```
 1              THE COURT:  Based on the testimony of Agent
 2    Fernandez?
 3              MS. SAMBATARO:  Yes, and the defendant is a
 4    former court marshal.  It's access to the mayor's
 5    office, it's access to those connections in the local
 6    court.  Agent Fernandez also testified in the prior
 7    hearing about the threat received by Brenda from a GPD
 8    officer that came to her house.  It's in the transcript
 9    from the prior hearing, he testified that -- and that
10    was the basis that the government invoked for the
11    detention hearing, and that this officer told her she
12    would be in trouble -- basically, she shouldn't lie to
13    the mayor or she would be in trouble because the
14    defendant was a previous Guam Police Department officer.
15    He was GPD, he was a Guam marshal, he still has ties in
16    both of those communities, he has contacts in both of
17    those communities.  In part, because he is the mayor of
18    Yona.  He is in a position of esteem and respect on the
19    island of Guam, even today, under federal indictment.
20              And so the government's concern is that
21    there are individuals in this community who would still
22    rally around him.  Not everybody, I'm sure, but there
23    are still people who would support him and give him
24    those connections that could allow him to commit
25    additional crimes, continue to commit his crimes, or
```

cause harm to the government's case or its ongoing

investigation.

THE COURT: Okay, well -- continue on.
There's a whole bunch of conditions that the Court is
supposed to look at, so I need you to --

MS. SAMBATARO: To address each one?

THE COURT: Yeah, to -- well, address the
ones that you believe are pertinent to your position.

MS. SAMBATARO: Yes, Your Honor.

THE COURT: You're saying that there are no
conditions or combination of conditions.

MS. SAMBATARO: Yes, Your Honor. So I
addressed release, I addressed home detention, another
-- third option such as location monitoring. My
understanding of location monitoring is that they have
to -- there would be a landline installed in the home
and if the person goes out of range of the landline,
probation is notified. And so you really have no means
to address except for on the back end of things. And
considering the defendant's brazenness in terms of his
violations of the law, the government considers that
condition inadequate in that it's really only
addressable on the back end once a violation has been
made.

THE COURT: You're worried that the mayor

might cut the electronic monitoring -- is it ankle?  Is
it ankle support?  Is that what it is, Jeff?

                PROBATION OFFICER:  Yes, Your Honor.

                THE COURT:  Yeah, that's what I thought.
You're worried if he cuts it, that there will be -- the
violation would have already occurred?

                MS. SAMBATARO:  Yes, Your Honor.

                THE COURT:  Okay.  What else?

                (Pause.)

                THE COURT:  How about number -- okay, are
you going down the line here?

                MS. SAMBATARO:  Yes, I am.

                THE COURT:  Where are you now, what number
are you at now?  Under G -- C, B.

                MS. SAMBATARO:  C, B...

                THE COURT:  There's, I think, 14 of these,
right?  Yeah, 14.

                (Pause.)

                THE COURT:  Are there any other persons in
the community that you're concerned about?  Who are you
concerned about?

                MS. SAMBATARO:  With regards to?

                THE COURT:  If the defendant were to be
released in any way, you're talking about danger to the
community.

                    MS. SAMBATARO:  Yes.

                    THE COURT:  You already talked about --
you've given me some idea with regard to -- I mean, your
position with regard to his access to the mayor's
office.

                    MS. SAMBATARO:  Yes.

                    THE COURT:  The court marshals, his Guam
Police Department access -- because of his prior
positions but what else are you -- who else were you
concerned -- who are you concerned about, in particular?

                    MS. SAMBATARO:  Well, Your Honor, the
community in general, but then also potential witnesses
-- this is an ongoing investigation.  The day the
defendant was arrested, there were search warrants
executed at the Yona mayor's office, on the defendant's
phone, and on the truck at the Yona mayor's office, and
he -- that's part of the supplemental discovery we're
providing to Mr. Razzano but based on some leads that we
developed from evidence we collected there, we're
pursuing ongoing witnesses and targets and so there's
also the concern we'd like to protect the integrity of
those investigations and potential future interviews.

                    THE COURT:  Okay.  So are you saying that --
that based on the execution of these warrants, as you
continue your investigation, there are certain

```
 1    individuals whose safety may be at risk, is that what
 2    you're arguing?
 3              MS. SAMBATARO:  It's their safety and also
 4    -- it's the safety argument, there's also a obstruction
 5    of justice argument in that there is that concern that
 6    approaches may be made with an attempt to influence an
 7    investigation.
 8              THE COURT:  So the -- earlier you argued
 9    that Brenda was told by an officer that she's not to
10    lie?
11              MS. SAMBATARO:  She was told --
12              THE COURT:  What was she told?
13              MS. SAMBATARO:  I'm going to the transcript
14    of the --
15              THE COURT:  Prior.
16              MS. SAMBATARO:  -- prior hearing.
17              THE COURT:  Yeah.
18              (Pause.)
19              MS. SAMBATARO:  Essentially --
20              THE COURT:  What page?
21              MS. SAMBATARO:  I can't find the page but
22    Agent Fernandez testified in the prior hearing that a
23    police officer went to Brenda's house and told her that
24    -- here it is, page 23, lines 3 to 7.  A police officer
25    came to her house and told her not to lie to the mayor
```

1    or that she would be in trouble.

2              THE COURT:  Okay.  Not to lie to the mayor?

3    Okay.  So are you saying that this type of behavior

4    right there is consistent -- or would also apply to

5    these other individuals that you're speaking of that

6    were identified pursuant to the investigation as it

7    relates to search warrants?

8              MS. SAMBATARO:  Yes, Your Honor.

9    Essentially, that action showed a propensity to... it

10   shows a propensity to attempt to wield influence over

11   people in order -- and at the time I don't know if he

12   knew he was under investigation but he was threatening

13   this person.  She had stopped paying bribes to him and

14   he was threatening her, and that shows a propensity to

15   --

16             THE COURT:  You're saying that the mayor was

17   threatening?

18             MS. SAMBATARO:  I'd say that -- through a

19   third-party, yes, and he also -- he also went to her

20   house, demanding money and was sending her text messages

21   demanding money.

22             THE COURT:  All right.  So the third person

23   was being directed by the mayor, is that your argument?

24             MS. SAMBATARO:  That would be the

25   government's inference from the fact that this police

officer went to her house and said, "Don't lie to the
mayor or you'll be in trouble."  I mean, the reasonable
inference from that is that the defendant was the person
that directed that activity.

          THE COURT:  Okay.

          MS. SAMBATARO:  How else would a police
officer know to go to this informant's house and make
those statements other than if it came from the mayor?

          THE COURT:  Okay.  Go ahead.

          MS. SAMBATARO:  And so the government's
contention is that that shows a propensity to try to
interfere with an investigation or make threats on other
persons, which makes us concerned that if released, he
would try to tamper with potential witnesses.

          THE COURT:  Okay.  You may proceed.

          MS. SAMBATARO:  Does the Court have any
other questions?

          THE COURT:  Well, I mean, is there anything
else that you want to address on these 14 conditions
that the Court is supposed to look at?

          MS. SAMBATARO:  I think, Your Honor, the
government's contention is that each of these would be
inadequate to address the concerns of the government
with regard to the safety of the community from future
crimes of the defendant and the integrity of its ongoing

1  investigation of the defendant's past actions have

2  showed a contempt of public authority, a contempt of --

3  basically, a feeling of the rules do not apply to him

4  and they show a willingness to blatantly engage in

5  criminal conduct and to use his power and his

6  connections to further that criminal conduct, and so

7  none of these conditions would be adequate to address it

8  where someone is so blatantly willing to violate the law

9  and threaten others and assault others and take bribes

10  and use a position of public authority.  So the

11  government's contention is none of these conditions

12  could adequately protect from those harms.

13            THE COURT:  All right.  Very well.

14            MS. SAMBATARO:  Thank you.

15            THE COURT:  Let's take -- Counsels, take a

16  15-minute recess and then we'll come back and I'll hear

17  from Mr. Razzano.  15 minutes.

18            Let me just thank all of you.  I'm sorry

19  that we started 30 minutes late but I had a jury

20  selection this morning and three guilty pleas, so that

21  just pushed us into -- instead of starting at 1:30

22  today, we had to start at 2:00, so thank you for your

23  patience on that.  Okay.  All right.  Thank you.  See

24  you in 15 minutes.

25            THE CLERK:  All rise.  The Court's in

1   recess.

2                  (Recess taken at 3:16 p.m.)

3                  (Back on the record at 3:38 p.m.)

4          THE COURT:  Okay, we're back.  We're back on

5   the record.  Okay, we're back on the record.  All

6   Counsels present, and Mr. Blas -- Mayor Blas is present.

7   Okay.  You may proceed, Mr. Razzano.

8          MR. RAZZANO:  Thank you, Your Honor.  Your

9   Honor, I was disappointed to hear what the government

10  had to say today.  You know, it's been 32 years since

11  they decided the case in *Salerno*.  When they did, the

12  United States Supreme Court decided that you had to

13  determine there was no set of conditions upon which

14  somebody could be released.  That case was against Mr.

15  Salerno and Mr. Cafaro, who were members of the Genovese

16  crime family and were indicted on conspiracy to commit

17  murder, and not just one murder, but two murders.  In a

18  6-3 decision, three justices of the Supreme Court

19  dissented and they could not believe that there would be

20  any way to detain a person pretrial.  Apparently,

21  32 years later, the standard -- or at least the

22  government argues that the standard should be far

23  different.

24          While *Salerno* was a crime of murder, RICO,

25  and conspiracy, this is a crime that involves no

violence. It's basically accepting a bribe. And if you
take the government's evidence at face value, the bribe
is not very large; in fact, it's quite small. It's not
a drug offense and the government quickly corrected
themselves when they said that Brenda is posing as a
drug dealer. She's not a drug dealer, there were no
drugs that ever came into these mailboxes and that is
part of the transcript of the last proceeding, so no
harm came to the community.

In the *Salerno* case, when the dissenting
judges, Marshall and Brennan, and I think Stevens, they
essentially say what the truth of the matter is, it's an
indictment is evidence of nothing. The only thing it's
evidence of is that at some point there will be a trial.
The government talks about the community being in danger
or Brenda being in danger or -- well, actually, the FBI
agent admitted that Ms. Teregeyo -- or I'm sorry, Brenda
was not in danger but Ms. Teregeyo may be in some
danger, but there has to be a condition that can be
fashioned by the Court to ensure there is no contact
with her and that she will be safe. And I think the
Court can fashion that condition with a no-contact
order, with house detention, with checking in with
probation every day. It can't be the high standard of
no set of conditions upon which she can be protected.

1           While the government makes a big deal out of

2    the fact that Mr. Blas is an elected official, that's

3    nowhere in the statute that that becomes some raised

4    crime or that he used to be a police officer or that he

5    used to be a court marshal.  Those are simply

6    achievements that Mr. Blas has made in his life as he

7    served the community of Guam.  And he continues to serve

8    the community of Guam as an elected official, a person

9    who is presumed innocent.  And the United States should

10   not be dictating the terms of how the government of Guam

11   runs its day-to-day business.

12          Mr. Blas has, really, no previous criminal

13   history, although there is some allegations of a

14   harassment charge, which as the Court pointed out is

15   nothing more than a petty misdemeanor and it happened

16   many, many years ago.  The Ninth Circuit in *Twine* says

17   that if we are simply talking about danger to the

18   community, that that's not in itself enough, that there

19   has to be more.  And so the Court, I think, has no

20   choice but to fashion conditions of release.  There's no

21   presumption and so Mr. Blas must be released.  Released

22   on whatever --

23          THE COURT:  You spoke about Mr. Blas's prior

24   -- I guess, criminal activity, if you will.  They've

25   indicated a prior harassment, I guess, a local charge,

and then what about Exhibit 1 that was played to the
Court today?

MR. RAZZANO:  Well --

THE COURT:  That exchange?

MR. RAZZANO:  I guess it depends on how you
-- how you see that exchange.  I mean, certainly, the
government's position is that it's a threat or that he
was doing something bad to Ms. Teregeyo, but it's also
been posed that he was performing as her third-party
custodian and was trying to get her to comply with her
conditions, and at the end, she says "I love you".
She's not in danger, she's not worried about her safety.
If she was, she wouldn't have got in the car.  So -- and
I guess I don't want to jump around but when the
government starts talking about the obstruction portion
of the statute, you have to show that a specific
witness, a specific juror, or a specific victim is at --
is at risk.  And regardless of what the FBI agent
testifies to, she's not worried, she still loves him,
and she gets in the car, and also, nothing happened.
Nobody was hit, nobody was harmed, nobody went to the
hospital, so there's no evidence of any of that.

THE COURT:  Well, the -- actually, the
statute says that upon motion of the attorney for the
government in a case that involves a serious risk that

such person would either obstruct or attempt to obstruct

justice or to threaten, injure, or intimidate -- let's

just use the word -- let's go into intimidate or attempt

to threaten, injure, or intimidate a prospective witness

or juror, you know, just that exchange in Exhibit 1,

it's just -- Mr. -- or Mayor Blas acknowledging that he

has slapped her, he's choked her, I mean, just in that

very angry voice exchange there, that -- one can infer

that that's pretty intimidating towards Ms. Teregeyo;

right?

MR. RAZZANO:  So if that's how the Court saw

it, then it is the duty of the Court to fashion a

condition in order to ensure her safety.  Whether that

condition, again, is home detention, whether that

condition is you're not allowed to use the internet,

whether that condition is you can't use your telephone,

whether the condition is the landline that you're gonna

have location monitoring on cannot make calls out, or if

you do make a call out or someone from your house makes

a call out, you're gonna go back to jail.  I mean, in

some of these investigations, with respect even to the

president.  I mean, Manafort and those guys were all

released, all of them.  Now, they violated their

conditions of release and they had to return to jail

because they wouldn't follow what the Court told them,

```
1    but they were released.  So there has to be a set of
2    conditions that can be fashioned in order to allow
3    Mr. Blas to be released but if he violates those
4    conditions, he will return to jail.
5              Mr. Blas would like to continue to work as
6    the mayor.  A position that he was elected to by the
7    people of Guam and a position that -- while I understand
8    the government's contention is he used that position to
9    -- in an abuse of power, but again, they're just mere
10   allegations.  And if he has to have a condition that
11   keeps him away from the office, then he should be able
12   to work from home or he should be able to have a
13   third-party custodian that goes with him everywhere in
14   order to continue doing his duties as a government
15   official.
16             THE COURT:  But isn't the concern by the
17   prosecutor that Mr. Blas used his position at his
18   office, at his place of employment, to commit the crime
19   in which he's involved in here?
20             MR. RAZZANO:  Sure.  And that's why I said
21   admittedly, that the Court could fashion a condition
22   that says he could not go to the office but he could
23   work from home, he could still deal with his
24   constituents by e-mail or through his other, you know,
25   employees at the office, through his administrative
```

assistant. They could communicate, even if he couldn't
speak directly with the constituents. There could be a
condition fashioned that would protect -- you know,
again, protect people under investigation or witnesses,
who they won't tell us who they are. We don't even know
who we're protecting. I mean, if you're listening to
the government, everybody is under investigation, every
question I ask is contemplating, you know, some other
investigation. So --

THE COURT: Am I to understand though that
you have received the discovery which indicates, you
know, the execution of the search warrant and then there
may have been names --

MR. RAZZANO: I have not.

THE COURT: Oh, you have not?

MR. RAZZANO: I have not gotten any
information on the search warrant from the mayor's
office. I learned about that from the newspaper. I
know that there was a search warrant on the truck
because Ms. Sambataro told me. I understand nothing was
found in the truck, but I haven't gotten the discovery
or the actual warrant. I understand his phone was
searched but the scope of the search warrant was small.
The only reason I know that is because Ms. Sambataro
shared that information with me but I have never seen

the warrant and I never seen a result of the search.

So while we are -- I'm not saying that the
government is not giving us things in good faith.  We've
received, you know, an initial set of discovery, an
audio recording this morning, and that's all I have
received in 34 days --

THE COURT:  Okay.  So -- I'm sorry, so
you're saying that insofar as the discovery that you
received that there are no other potential witnesses --
there's no jurors because we don't have any jurors right
now but any potential or prospective witnesses that you
know of?

MR. RAZZANO:  I don't know of any.

THE COURT:  In terms of the names?

MR. RAZZANO:  The only person I know they're
investigating is what the FBI agent told me, that Joey
Terlaje is under investigation.  I don't know of anybody
else who is under investigation, and I don't think any
other names were shared, no matter how many times I've
asked.

THE COURT:  Okay.

MR. RAZZANO:  You know what the government
said, and I think what the Court is now sort of moving
to is Ms. Sambataro says the government doesn't have
faith in him.  Well, that really doesn't matter, because

the question is, is there a set of conditions this Court can fashion in order to make sure that the people they're worried about are safe?  Of course the government wants detention, the government wants a conviction, but the Court here is placed to be the check on the king.  We know that the king wants detention, but a separate and detached Court is the one who determines release, especially at pretrial and detention is the harshest of any condition.  This is why it's not favored, this is why the Bail Reform Act recognizes that there are certain things that we're gonna go ahead and admit have a presumption.  Conspiracy to commit double murder, drug crimes, violent crimes, not taking $300 to have a mailbox.

And the threat -- I guess I'm a little off, but the threat that they talk about with the police officer -- and you can look at my cross-examination in the transcript, Brenda never gets hurt.  She never gets touched, she's not physically harmed.  Although they made these accusations about lewd comments, there's no evidence she ever had sex with him or did anything with him.

THE COURT:  You think she was intimidated?

MR. RAZZANO:  I seriously doubt that she was intimidated, Your Honor.  I don't even know if it

1   occurred.  And I think when you look at Defendant's 1

2   more closely, you'll see that Brenda is just the kind of

3   person that would tell anybody any story to make sure

4   that she's not the one in trouble.  She's telling them

5   this, so she can get credit, and I'm sure she will, but

6   she's not harmed.  In any event, she's not harmed at

7   all.  And the FBI agent testified that Brenda is not in

8   any danger, so we know even under the obstruction

9   portion of the statute that the government moves under,

10  the evidence before the Court is she's in no danger.

11          So in closing, Your Honor, the Bail Reform

12  Act recognizes that the presumption of innocence has not

13  been changed in the United States Constitution.  The

14  Reform Act simply was passed by Congress in order to

15  give Courts a set of standards that they could follow

16  when determining pretrial release or confinement.

17  Confinement being the highest standard I could think of,

18  which is no set of conditions in order to release a

19  pretrial detainee.  And if you don't have any further

20  questions, Your Honor, I'm finished.

21          THE COURT:  Thank you, Mr. Razzano.

22          MR. RAZZANO:  Thank you.

23          THE COURT:  Ms. Sambataro?

24          MS. SAMBATARO:  Your Honor, Mr. Razzano's

25  argument would have the Court believe that it must zero

in on these specific harms to Ms. Teregeyo and to Brenda
in order to make the determination as to whether or not
the defendant poses a danger.  However, the Bail Reform
Act specifically permits pretrial detention when there
is no assurance that release is consistent with the
safety of another person or the community.  And as the
Ninth Circuit said in *United States versus Motamedi* at
767 F2d 1403, "we must presume that Congress acts with
deliberation, and not inadvertence when drafting a
statute."  Once one of these provisions under 3142(F)
are invoked, which in this case the government invoked
the potential that the defendant would obstruct justice,
it is perfectly permissible for the Court to consider
the defendant's danger to the community as a whole.  And
so the government asks the Court to look at the harm the
defendant poses based on his past actions with regard to
Ms. Teregeyo, with regards to Brenda, looking at the
whole community.

          Now, I do want to address -- in case the
Court is concerned, we are working on supplemental
discovery for Mr. Razzano.  I received documents from
the FBI last Thursday, so it's being processed.  That is
ongoing and that is just to alleviate any concerns the
Court might have.  Now, with regard to other individuals
under investigation, one name was revealed.  The

1  government generally does not -- the Department of

2  Justice does not reveal the names of individuals under

3  investigation but not indicted because of -- and that

4  bell cannot be unrung but, generally, we do not do that.

5  We do have active ongoing investigations based on

6  information we have uncovered, and there is a desire to

7  protect the integrity of those investigations, but

8  really what we're looking at is the entire picture of

9  the defendant and whether or not there are any

10  conditions that this Court can fashion that will protect

11  the community, and looking at his past harms, Your

12  Honor, we don't -- we can't take the defendant on faith.

13        The *United States versus Hir,* which is a

14  Ninth Circuit case, 517 F3d 1081, the Court actually

15  rejected alternatives to detention because they depend

16  on the defendant's good faith compliance and they found

17  that there was an unacceptably high risk that the

18  defendant would not comply in good faith in that case,

19  and now the crimes charged in that case are different

20  from this case but I would point to that -- that

21  argument there with regard to this defendant in that we

22  have somebody that has abused a position of public

23  trust, that has used his access to the courts, to the

24  Guam marshals, and to the police department to harm

25  others, to wield influence over others, and to harm the

community and so this is not somebody that the Court

should place its faith in his good faith compliance with

any number of conditions that the Court could fashion,

because, frankly, this is someone who thinks he is above

the law; he said as much to Ms. Teregeyo in that

recording.  And now Mr. Razzano has taken his

interpretation of it but the Court is free to take its

own, and the words out of his mouth were not that he was

trying to help her, it was "I have access to the courts,

I have power in those courts," and it was after him

acknowledging that he hit her, he choked her, he

assaulted her.  This is somebody who has power and who

has -- and is willing to use that power to benefit

himself and harm others and this is not someone that we

should take on faith, Your Honor, this is somebody that

we should hold pretrial.

The Bail Reform Act does restrict pretrial

detention but it does allow it and it allows it for

dangers to the community, and Your Honor, the government

would find that the Court -- use that power and a

finding of danger to the community, to find that there

are no conditions with which we can take the defendant

on faith that he will comply with in a way that will

protect the community.

THE COURT:  What do you think of

1  Mr. Razzano's suggestion that I allow or that the Court

2  -- yeah, impose a condition of teleworking as a mayor

3  from his home?  You heard that?

4           MS. SAMBATARO:  Yes, Your Honor.

5           THE COURT:  And he's indicated that if we

6  were to go to the mayor's office, that a third-party

7  custodian would sit with him, I suppose, I think that's

8  what his second suggestion was.

9           MS. SAMBATARO:  Well, and Your Honor -- so

10  the government is not -- obviously, the defendant was --

11          THE COURT:  I want to hear what you have to

12  say, but I'm also going to ask my probation pretrial

13  officer about that too --

14          MS. SAMBATARO:  Yes.

15          THE COURT:  -- but go ahead.

16          MS. SAMBATARO:  Yes.  So my understanding is

17  he's still able to conduct business as the mayor while

18  incarcerated.

19          THE COURT:  Oh, he's still the mayor while

20  he's in the prison -- or the detention center, is that

21  what you just said?

22          MS. SAMBATARO:  Yes, Your Honor, he's

23  apparently on an annual leave.

24          THE COURT:  Okay.

25          MS. SAMBATARO:  But my understanding he's in

1    contact with -- with the head of the mayor's council as

2    well as members of his office.

3              THE COURT:  So he's conducting business

4    activity while detained?

5              MS. SAMBATARO:  Yes, Your Honor.  And at

6    least while detained, his phone calls can be monitored

7    and so they can be monitored to make sure that he's just

8    conducting business activities versus engaging in

9    additional crimes or obstructing justice.  There's no

10   way to monitor his activities from his home and with

11   regard to a third-party custodian, that would be a large

12   undertaking for any third-party custodian, but also,

13   we're taking that person on faith and as the

14   government's contended, we don't -- we don't think that

15   this Court should take the defendant on faith that he

16   will comply.

17             THE COURT:  Okay.  All right.  Thank you.

18   Can I hear from Mr. Ventura, our pretrial probation

19   officer?  You've heard the --

20             PROBATION OFFICER:  Yes, Your Honor.

21             THE COURT:  You've heard the arguments today

22   and let me ask you:  Have you had an opportunity to

23   review the transcript of the hearing before Judge

24   Manibusan?  Have you -- yeah, have you had an

25   opportunity to review that transcript?

1          PROBATION OFFICER:  Not in its entirety.

2          THE COURT:  But have you reviewed some of

3 it?

4          PROBATION OFFICER:  Yes, Your Honor.

5          THE COURT:  So just based on today's

6 arguments and -- yeah, based on today's arguments, can I

7 get your opinion about what you believe with regard to

8 whether or not there are any conditions or combination

9 of conditions that you, as a pretrial officer, would be

10 monitoring that could reasonably assure the safety of

11 any other person in the community.

12          PROBATION OFFICER:  Yes, Your Honor.  Again,

13 at issue are the conditions of release to ensure the

14 safety of the community.  From the probation standpoint,

15 we're looking at Rule 3142(C), and with that for

16 analysis, there are two main concerns for danger,

17 specifically, which are, one, the defendant's abusing

18 his position as mayor by giving drug traffickers access

19 to the mailboxes to receive packages and narcotics, and

20 number two, defendant making threats to inform.  In

21 reviewing the Rule 3142(C), we determined that there are

22 no conditions that can mitigate the defendant's ability

23 to use his position of authority, even coupled with the

24 defendant's history of using violence and making threats

25 to reasonably assure the defendant is not a danger to

1    the community.

2              Even with the assessments that haven't been

3    conducted for location monitoring or a third-party

4    custodian because those haven't been completed yet at

5    this time.  Ultimately, we don't know if any known

6    conditions or combination of conditions, that can be

7    imposed on a person with a position of authority who

8    also has influence and reach with local authorities, as

9    mentioned earlier, in the testimony today for the

10   defendant's release.

11             THE COURT:  Now, I asked Mr. Razzano the

12   same question I asked Ms. Sambataro.  Mr. Razzano had

13   suggested that Mr. Blas -- Mayor Blas, be allowed to

14   either, A, continue to work at the mayor's office or, B,

15   continue to work there with a third-party custodian but

16   be telework and then there would be some monitoring.  I

17   guess there's monitoring both ways, assuming the Court

18   were to release him, but what is your position regarding

19   that in terms of any conditions that could be imposed in

20   terms of assuring the safety of the community and any

21   other person?

22             PROBATION OFFICER:  Yes, Your Honor.  Again,

23   going to 3142(C) and reviewing those proposed conditions

24   of release in the statute, none of those would really

25   monitor -- it's more -- actually, ultimately, it's

really difficult to monitor somebody's -- in this case

because of their position, their authority.  I mean, how

can you monitor that really?  There -- there's nothing

known to that, because either whether he's at home or

whether he's in the office, whether he's in another

area, he still holds that position of authority and

that's the real problem.

THE COURT:  So like Ms. Sambataro indicated

that, of course, his phone calls are all monitored at

the detention facility because as a matter of course, if

you're on phone and you're a detainee, you're being

recorded.

PROBATION OFFICER:  That's correct, Your

Honor.  I mean, it is extreme but then, again, it's

reasonable.  Again, where it would be reasonable is to

ensure the safety of the community because if he's

detained, everything is monitored 24/7, his phone calls,

people coming in and out.  If he's released, even on

location monitoring, we can't monitor anybody who's

coming in and out of the house.  Location monitoring

only monitors his whereabouts.  And again, as the

government said earlier, if he cuts that monitor or if

he does things ahead of time, we possibly will get that

delayed -- I mean, delayed response.

THE COURT:  What about monitoring phones,

                                   like landlines -- I guess because you'd have to have a

1    like landlines -- I guess because you'd have to have a

2    landline anyway if there was ever electronic monitoring.

3                PROBATION OFFICER:  Yes.  We don't have that

4    capability, Your Honor.

5                THE COURT:  Does pretrial have --

6                PROBATION OFFICER:  Not on pretrial, Your

7    Honor.  No, Your Honor.

8                THE COURT:  Monitoring a landline?

9                PROBATION OFFICER:  No, Your Honor.

10               THE COURT:  And what about with regard to --

11   these are suggestions by the defense counsel, internet,

12   computer, and I suppose also cell phones?

13               PROBATION OFFICER:  We don't have that

14   capability for pretrial, no.

15               THE COURT:  Okay.  Do you have any

16   questions, Counsels?  Of my -- of Mr. Ventura?  I'll ask

17   Ms. Sambataro:  Do you have any questions of

18   Mr. Ventura?

19               MS. SAMBATARO:  No, Your Honor, thank you.

20               THE COURT:  Mr. Razzano, do you have any

21   questions?

22               MR. RAZZANO:  No, I don't have any

23   questions, Your Honor, but I would point out that if --

24               THE COURT:  Yeah.

25               MR. RAZZANO:  -- Mayor Blas is still, as

they say, running the mayor's office from the jail, then
I would point out that there's no evidence in the last
34 days of any conduct that affected any witness or any
juror or any victim.  He's been in full compliance, and
so if we're looking at conduct, then the conduct over
the last 34 days is he's been in complete compliance,
and so that should be taken into consideration by the
Court, that if the Court does fashion an order that
tells him to do something, he will comply with it.  The
idea about the phone calls being monitored, I guess is
-- is quite unbelievable because I don't think that you
would find in any court in the United States where
there's ever been a condition of monitoring someone's
phone calls.  What -- why do they need to be monitored?
You simply do what they did with the defendants in the
Trump case, you tell them don't use the internet, don't
use Facebook, don't make the phone call, and if you do,
they put you in jail.  And that's what happened to those
defendants.  They violated their use of Facebook, they
went on the internet and they posted stuff about their
case and the judge jailed them.  That's what you should
be thinking about here.  There's no extortion or bribery
case in the country under $5,000 where someone's been
detained pretrial.  He's not a danger to anyone because
he's gonna pick up the telephone, and if he does, he

could be jailed.  And he certainly could be jailed just
on a basic revocation hearing without a written order
because he's not following what the Court is telling him
to do.  There are people in the community today, walking
around, who are known drug dealers, indicted under this
Court, and presumed to have to go to prison.  They're
out in the community today, working, getting treatment,
going to Lighthouse, enjoying their family.

This man, all he did, if you believe what
the government's case is, is he took some money and he
gave somebody a mailbox key.  And the threat was I'm
gonna take your key away.  He's not a danger to the
community, and if he's danger to that young lady who
doesn't live on Guam, we can figure out a set of
conditions to protect her.  That's what the Court has to
do.  That's what the Ninth Circuit demands.

THE COURT:  All right.  Thank you, Counsels.
Anything further?  You can close if you'd like and then
I'll...

MS. SAMBATARO:  Your Honor, I'd note that
Mr. Razzano said he's been compliant; well, he's been in
jail, so that's mitigated the risk from the government's
perspective, and this wasn't just taking of some money,
this was $300, then $2,500, then taking $5,000 and
keeping 4,900 of it, then taking $4,000, then asking for

1   an additional $15,000 for a second mailbox with the

2   express knowledge that these mailboxes would be used to

3   bring in drugs, and then demanding $8,000 or he would

4   cut off access.  That's what's alleged in this case and

5   then the Court has before it all the other evidence

6   before it and so this isn't just some small $300 bribery

7   case, Your Honor, this is someone taking substantial

8   amounts of money using his position to do so.

9           THE COURT:  All right.  Thank you.  All

10  right.  Because the Counsels asked me to incorporate by

11  reference the transcript where Agent Fernandez testified

12  previously, I want to include that in my written

13  decision so I'm not going to be able to issue that

14  today.  So the Court will issue that shortly, after

15  today, and in the meantime, the defendant will continue

16  to be detained until I issue my decision.

17          All right.  Thank you, Counsels.

18          MR. RAZZANO:  Thank you, Your Honor.

19          THE CLERK:  The Court's adjourned.

20          (Proceedings concluded at 4:09 p.m.)

21                      * * *

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


CITY OF HAGATNA      )
                     )  ss.
TERRITORY OF GUAM    )


      I, Veronica F. Flores, Official Court Reporter for the United States District Court of Guam, do hereby certify the foregoing pages, 1 to 84, to be a true and correct transcript of the proceedings held in the above-entitled matter, to the best of my ability.

      Dated this 3rd day of June 2020.


                 /s/Veronica F. Flores
                 Veronica F. Flores