IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

UNITED STATES OF AMERICA,           ) Criminal Case No. 19-00036
                                    )
                  Plaintiff,        )
                                    )
          vs.                       )
                                    )
JESSE MENDIOLA BLAS,                )
                                    )
_____    Defendant.   _)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE FRANCES TYDINGCO-GATEWOOD
MAY 27, 2020; 1:37 P.M.
HAGATNA, GUAM

Continued Status Conference

(Via VTC)

Proceedings recorded by *mechanical stenography*.

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

APPEARANCES


Appearing on behalf of plaintiff:


OFFICE OF THE UNITED STATES ATTORNEY
BY: LAURA SAMBATARO, AUSA, (via VTC)
MIKEL SCHWAB, AUSA, (via VTC)
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
(671) 472-7332


Appearing on behalf of defendant:


LAW OFFICE OF CIVILLE & TANG
BY: JOSEPH RAZZANO, ESQ. (via VTC)
330 Hernan Cortez Avenue, Suite 200
Hagatna, Guam 96910
(671) 472-8868


ALSO PRESENT:

Major Antoine Aguon, DOC

Lt. Arsenio Espino, DOC

Dr. Patricia Taimanglo, DOC

Stacey Coletta, Proposed third-party custodian

Beau Blas, Son

Tanya Muna, USMS

John Untalan, USMS

Janet Yamashita, USPO

I N D E X

Page

Examination of Third-Party custodians          63

Court to hold matter under advisement and issue
decision tomorrow                              69

01:08:56PM
01:08:56PM

Veronica F. Flores, CSR-RPR
Official Court Reporter
520 W. Soledad Avenue
Hagatna, Guam 96910

```
 1                    May 27, 2020; 1:37 p.m.; Hagatna, Guam

 2                               * * *

 3                                                                  01:37PM

 4            THE COURT:  You may call the case then, please.       01:37PM

 5    Thank you.                                                    01:37PM

 6            THE CLERK:  Please come to order.  The District       01:37PM

 7    Court of Guam is now in session.  The Honorable Frances      01:37PM

 8    Tydingco-Gatewood presiding.  Your Honor, this is Criminal   01:37PM

 9    Case No. 19-00036, United States of America versus Jesse     01:37PM

10    Mendiola Blas, Continued status conference.  Counsel for the 01:38PM

11    government, please state your appearance.                    01:38PM

12            MS. SAMBATARO:  Good afternoon, Your Honor,           01:38PM

13    Assistant United States Attorney Laura Sambataro on behalf of 01:38PM

14    the government.  I have Mikel Schwab, our civil chief, in the 01:38PM

15    U.S. Attorney's office conference room.                      01:38PM

16            THE COURT:  Very good.  Thank you, Ms. Sambataro      01:38PM

17    and Mr. Schwab.  Good afternoon.                             01:38PM

18            THE CLERK:  Counsel for defense, please state         01:38PM

19    your appearance.                                             01:38PM

20            MR. RAZZANO:  Good afternoon, Your Honor, Joseph      01:38PM

21    Razzano on behalf of Jesse Mendiola Blas, who is present at  01:38PM

22    the United States Marshal's office and hearing on this video. 01:38PM

23    Also today we have Stacey Coletta and Beau Blas, who are the 01:38PM

24    proposed third-party custodians.                             01:38PM

25            THE COURT:  Okay.  And the Court also has -- um,      01:38PM
```

1   (feedback) here we also have my U.S. -- Janet Yamashita and          01:38PM

2   Ms. Tanya Muna, US Marshal, judicial -- (feedback).                   01:39PM

3          Okay.  Before -- let me just go ahead and begin,              01:39PM

4   if you don't mind everyone.  I asked Tanya to give us a               01:39PM

5   virtual tour of the accessibility we're talking about with           01:39PM

6   regard to the attorney-client room.  And so I actually talked        01:39PM

7   to her after our last hearing and said, "Hey, maybe I should         01:39PM

8   just go down there and just tour it with the attorneys if they       01:39PM

9   want to," and I think that idea was not well received by the         01:39PM

10  U.S. Marshals and so they just said, "Judge, perhaps maybe           01:39PM

11  we'll just do a virtual tour."  So she is -- Tanya, can you          01:39PM

12  just explain where you are and what you're doing?  She's going       01:39PM

13  to give us a virtual tour, as we speak, live.                        01:39PM

14          MARSHAL MUNA:  So right now I'm at the federal               01:39PM

15  detention facility and this is the secured area where the            01:39PM

16  attorney would walk in.  So this is secured and then this is         01:39PM

17  the area where the attorney would sit to confer with their           01:40PM

18  client and this is the glass where the attorneys meet.               01:40PM

19  There's various air conditioning in the room and it's a              01:40PM

20  private room and it's about 11x12.                                   01:40PM

21          THE COURT:  Okay.  And what is this -- what is               01:40PM

22  this -- I know they said there's four possibilities for              01:40PM

23  attorney-client access.  And this is -- what is this called,         01:40PM

24  the attorney-client room?  What do they call it there?               01:40PM

25          MARSHAL MUNA:  Yes.  It's very similar to what we            01:40PM

1    have at the District Court in the cellblock.  It's just                01:40PM

2    configured differently with glass instead of a mesh wire.              01:40PM

3              THE COURT:  Okay.  Very well.                                01:40PM

4              MARSHAL MUNA:  So this area in itself, they can              01:40PM

5    put the defendant or the attorney in here and socially                 01:40PM

6    distance them if they wanted to be in the same room because            01:41PM

7    this room is secure.                                                   01:41PM

8              THE COURT:  Uh-huh.                                          01:41PM

9              MARSHAL MUNA:  So this would be one chair.  That             01:41PM

10   would be one chair and then that will be another chair and             01:41PM

11   that's more than 6 feet apart.                                         01:41PM

12             THE COURT:  Okay, so that's just -- okay, so                 01:41PM

13   that's just attorney -- that's called the attorney-client              01:41PM

14   room.  And was the air conditioner just recently placed in             01:41PM

15   there as a result of the last hearing -- or not the last               01:41PM

16   hearing but the hearing that we had with the public defenders?         01:41PM

17             MARSHAL MUNA:  I'm not sure.  It seems that                  01:41PM

18   they're very brand new air conditioners, so...                        01:41PM

19             THE COURT:  Okay.  Okay.  Very well.  So that's              01:41PM

20   number one.  Any questions, anybody -- I'll ask Mr. Razzano            01:41PM

21   first and then Ms. Sambataro and/or Mr. Schwab.                        01:41PM

22             Mr. Razzano, do you have any questions regarding             01:41PM

23   the attorney-client room?  We can't hear you, Mr. Razzano.             01:41PM

24   Sorry.                                                                 01:42PM

25             MR. RAZZANO:  Sorry about that.  I'd like to                 01:42PM

start with the statement that the Court made that the visit to

the actual facility was not well received by the U.S.

Marshals.  Why -- what concerns did the marshals have?

THE COURT:  Okay.  Tanya, you want to just tell

her -- tell him?

MARSHAL MUNA:  Well, it was the amount of people

that were going to be here and it's hard to socially distance

with the amount of offices they have.  We could have done it,

but everybody would be spread apart and we'd have to use lots

of resources to keep everybody within the socially-distanced

space.  So --

THE COURT:  Okay.  That was the biggest reason,

yeah.  Was that the only reason, Tanya -- or Ms. Muna, excuse

me.

MARSHAL MUNA:  Yes.

THE COURT:  Okay.  So that's the reason,

Mr. Razzano.

MR. RAZZANO:  Okay.  And then when we went to

enter the prison, where would we enter?

MARSHAL MUNA:  The same place that you would

enter, so from the far side where the pavilions are.

MR. RAZZANO:  And would there be arrangements

that there would be no other people other than the officers,

who would -- I guess who would need to pat us down.  Would

there be any other people there?  Normally there are, but is

```
 1   there a way to make arrangements to make sure nobody comes in      01:43PM
 2   and out of the office?  And I guess what I'm saying is how          01:43PM
 3   many human beings am I going to come into contact with,            01:43PM
 4   including the time I'm at the door and the time I enter this       01:43PM
 5   room?                                                              01:43PM
 6              MARSHAL MUNA:  So you would be in contact with          01:43PM
 7   the officer that's going to take your temperature and have you     01:43PM
 8   sign the affidavit saying you're not sick and you haven't          01:43PM
 9   traveled.  And then there will be nobody in the pavilion area      01:43PM
10   and then you'll be escorted to the secure track and then there     01:43PM
11   shouldn't be anybody there.  I've been here three times --         01:44PM
12   three times today and the only person with me was the officer      01:44PM
13   escorting me.                                                      01:44PM
14              MR. RAZZANO:  Okay.  And what is the status of          01:44PM
15   how the room is and everything is being cleaned at the             01:44PM
16   facility?                                                          01:44PM
17              MARSHAL MUNA:  Um, you're going to have to ask          01:44PM
18   the representative at the facility but this room is clean.  I      01:44PM
19   mean, it's clean as it can be, it's an older facility...          01:44PM
20              THE COURT:  May I just ask -- thank you,                01:44PM
21   Mr. Razzano, good questions.  Inspector Muna, are there any        01:44PM
22   representatives there that can answer that question in terms       01:44PM
23   of the disinfection frequency of that room?                       01:44PM
24              MARSHAL MUNA:  There's just the officers that are       01:44PM
25   assigned to escort, but the lieutenant in charge of this area     01:44PM
```

```
 1   is not here right now.                                    01:45PM
 2            THE COURT:  Any other questions, Mr. Razzano?     01:45PM
 3            MR. RAZZANO:  No, that's it for that room.  Thank 01:45PM
 4   you.                                                      01:45PM
 5            THE COURT:  Okay.  Ms. Sambataro, do you have any 01:45PM
 6   questions?  Do you or Mr. Schwab have any questions of     01:45PM
 7   Inspector Muna?                                            01:45PM
 8            MS. SAMBATARO:  Um, I would just ask, um, to the  01:45PM
 9   extent an attorney needs to bring in papers for discovery or a 01:45PM
10   laptop to review discovery or videos with their client, are 01:45PM
11   they able to do so in that room?                          01:45PM
12            MARSHAL MUNA:  Those arrangements have got to be  01:45PM
13   made through Major Antoine Aguon, his e-mail address and   01:45PM
14   telephone number and -- and there needs to be more        01:45PM
15   coordination between DOC and the attorneys, and then      01:45PM
16   supervising deputy John Untalan can get -- run interference to 01:45PM
17   make sure proper visitation happens.                      01:45PM
18            THE COURT:  Okay.  Am I to understand that this   01:45PM
19   room is just recently built or, you know, formed, fixed up for 01:46PM
20   the attorneys to meet with their client, Inspector Muna?   01:46PM
21            MARSHAL MUNA:  I'm not sure.  Um, since I got     01:46PM
22   transferred back to Guam from Hawaii, this room has always 01:46PM
23   been here, but whether or not it was being used or was a   01:46PM
24   different -- I don't know what the attorneys were using at the 01:46PM
25   time but this room has always been here.                  01:46PM
```

```
 1          THE COURT:  Maybe -- Mr. Razzano, would you know?    01:46PM
 2  Because you've been a defense lawyer, would you know if that  01:46PM
 3  room has never been used?                                     01:46PM
 4          MR. RAZZANO:  I -- I had never been in that room,     01:46PM
 5  no, Your Honor.  Yeah, and Ms. Travis is here with me as well, 01:46PM
 6  she said she's never seen it.                                 01:46PM
 7          THE COURT:  I see, okay.  Okay.  So we don't have     01:46PM
 8  anybody that really can answer that question so far.  I mean, 01:46PM
 9  that's a different question.  All right --                    01:46PM
10          PROBATION OFFICER:  Your Honor, this is              01:46PM
11  probation, I'm sorry your question is whether it's a          01:46PM
12  newly-constructed room?                                       01:46PM
13          THE COURT:  Yeah, a newly-formed room or --          01:47PM
14          PROBATION OFFICER:  No, that room has been there     01:47PM
15  -- I've been in that room a few years back to do a PSR        01:47PM
16  interview.                                                    01:47PM
17          THE COURT:  You have been in that room, and it       01:47PM
18  looks just as it appears?                                     01:47PM
19          PROBATION OFFICER:  Yes, Your Honor.                 01:47PM
20          THE COURT:  Okay, but it -- (echo.)                  01:47PM
21          (Pause.)                                             01:47PM
22          PROBATION OFFICER:  I'm sorry, Your Honor, could     01:47PM
23  you repeat that?                                              01:47PM
24          THE COURT:  I said has it been available for         01:47PM
25  lawyers to use, do you know?  Do you have any knowledge?      01:47PM
```

| | |
|---|---|
| 1 | PROBATION OFFICER:  I'm not aware of that, Your | 01:47PM |

PROBATION OFFICER:  I'm not aware of that, Your Honor.

THE COURT:  Okay.  Yes, okay.

MR. SCHWAB:  Your Honor, I do have some knowledge.  We took, of course, the tour after your last hearing --

THE COURT:  I'm sorry, I don't -- is that -- I can't see if you're speaking -- are you speaking?

MR. SCHWAB:  It's me, Mr. Schwab.

THE COURT:  Yes.  Go ahead, sir.

MR. SCHWAB:  We took a tour of that room months ago and it was newly fixed up at the time.  It had fallen out of use and they put new air conditioning in it and it was actually used for two rooms, but with a barrier in between. Now the barrier is used so that it's now for one room, but the barrier is used to keep social distancing.  So the social distancing barrier in use is new but the two rooms existed as of a few months ago and they did not exist prior to that, they had fallen out of use.

MS. SAMBATARO:  Your Honor, something we've learned -- we met with -- yesterday with Mr. Razzano at the U.S. attorney's office and I think DOC has had these spaces available but the defense bar hasn't been getting the information about the availability and how to take advantage of that, so I think that has contributed to the issues we're

Case 1:19-cr-00036   Document 89   Filed 06/16/20   Page 11 of 70

```
 1    seeing.  They're willing to make accommodations but they're      01:48PM
 2    just not communicating it well but -- something I've observed    01:48PM
 3    just over my cases and my communication with defense attorneys   01:48PM
 4    and with DOC.                                                    01:49PM
 5              THE COURT:  Okay.  All right.  Any other further       01:49PM
 6    questions?                                                       01:49PM
 7              MARSHAL MUNA:  So -- Laura, this is Tanya.             01:49PM
 8              THE COURT:  Yes, Ms. Muna?                             01:49PM
 9              MARSHAL MUNA:  If you get any information like         01:49PM
10    that, you can refer that to supervisor deputy John Untalan to    01:49PM
11    clarify the resources that are here and he's available to        01:49PM
12    answer questions like that instead of going round and round.     01:49PM
13    Please refer them over to John Untalan.  About --                01:49PM
14              THE COURT:  Is he there right now, Tanya, or is        01:49PM
15    he on the line?                                                  01:49PM
16              MARSHAL MUNA:  No, he -- I'm sorry Your Honor, he      01:49PM
17    stepped away, that's why I'm here doing that.                    01:49PM
18              THE COURT:  I'm sorry, he what?                        01:49PM
19              MARSHAL MUNA:  He's on leave.                          01:49PM
20              THE COURT:  I see.                                     01:49PM
21              THE CLERK:  Your Honor, excuse me, this is Carmen      01:49PM
22    -- he is on the line.                                            01:49PM
23              THE COURT:  Oh, okay.  Mr. Untalan, okay.  Yeah,       01:49PM
24    Mr. Untalan, you're on the line, I understand.  So can you       01:49PM
25    answer the questions, any of the questions that Mr. Razzano --   01:49PM
```

1  the one question he asked?                                        01:49PM

2            MR. UNTALAN:  I'm sorry, Your Honor, say again?          01:50PM

3            THE COURT:  Go ahead, Mr. Razzano.                       01:50PM

4            MR. RAZZANO:  I think the only question that             01:50PM

5  couldn't be answered so far was whether or not -- what was the    01:50PM

6  status of how they're sanitizing the room and how they're        01:50PM

7  cleaning the surfaces and, basically, you know, how are they      01:50PM

8  being maintained to comply with the CDC recommendations?         01:50PM

9            MR. UNTALAN:  Um, to get specific and detailed          01:50PM

10 information on that, I can find out and get back to you,          01:50PM

11 Mr. Razzano.  I do not have that information off the top of my    01:50PM

12 head.                                                             01:50PM

13           THE COURT:  Okay, that would be great, thank you.       01:50PM

14 Yeah, please let us know that.                                    01:50PM

15           MS. SAMBATARO:  Your Honor, if I could --               01:50PM

16           THE COURT:  Go ahead.                                   01:50PM

17           MS. SAMBATARO:  I'm sorry to jump in, Your Honor,       01:50PM

18 but when we met with DOC yesterday, Major Aguon did              01:50PM

19 communicate to us that they were following all CDC guidelines,   01:50PM

20 and I thought Major Aguon was actually on the phone on this      01:50PM

21 hearing as well, if we have any questions for him.               01:50PM

22           THE COURT:  Is he on the line?                          01:50PM

23           THE CLERK:  Yes, Your Honor, he is.                     01:51PM

24           THE COURT:  Oh, okay.  Major Aguon, can you            01:51PM

25 answer that, is that true?                                        01:51PM

```
 1          MR. AGUON:  I'm sorry, Your Honor, can they          01:51PM

 2   repeat the question?                                        01:51PM

 3          THE COURT:  Mr. Razzano, can you repeat your         01:51PM

 4   question again?                                             01:51PM

 5          MR. RAZZANO:  Sure.  Sure.  We're just trying to     01:51PM

 6   determine how that room that we're looking at right now is  01:51PM

 7   being sanitized, how the surfaces are being cleaned, and    01:51PM

 8   whether or not it's in line with the CDC regulations?       01:51PM

 9          MR. AGUON:  Yes, sir, the places are being           01:51PM

10   cleaned.  The facility has bleach and other cleaning supplies 01:51PM

11   and the rooms are cleaned out daily.  They're also cleaned  01:51PM

12   after each use.  They're all -- they'll go in there and wipe 01:51PM

13   it all down and clean it all up and make it ready for the next 01:51PM

14   person to use it if it's going to be used, but right now --  01:51PM

15   right now, we haven't had a lot of attorneys coming in at all 01:51PM

16   using any of the facilities at this time.                   01:51PM

17          (Pause.)                                             01:51PM

18          THE COURT:  Okay, so -- well, yeah.  Yeah.           01:51PM

19   probably not a lot of attorneys coming in because of the COVID 01:51PM

20   outbreak, but can I ask you, Mr. Aguon, are attorneys told  01:52PM

21   that that room is available for them to use with their client 01:52PM

22   for a private manner, such as they won't be interrupted at  01:52PM

23   all?  Are they told that?                                   01:52PM

24          MR. AGUON:  Your Honor, when most attorneys come     01:52PM

25   in, they ask to meet their clients.  If they do need a more 01:52PM
```

1  private area, they do ask for it and we have accommodated them  01:52PM
2  in that area.  You know, oftentimes, even after this last  01:52PM
3  meeting, the previous court hearing, when we got all that room  01:52PM
4  fixed up, we advised the attorneys to use it and they still  01:52PM
5  didn't want to use it, they'd rather speak outside.  So  01:52PM
6  sometimes even the attorneys, Your Honor, are giving mixed  01:52PM
7  signals whether they want to use it or not.  And they choose  01:52PM
8  sometimes just to do it right outside in the visitation area  01:52PM
9  but we do let them know if you need something more, you let us  01:52PM
10  know what -- how we can accommodate you better, but you know,  01:52PM
11  we -- I cannot -- we cannot determine what they're really  01:53PM
12  looking for unless they say something and then we'll make  01:53PM
13  whatever reasonable attempts to accommodate them.  Now, that  01:53PM
14  room has been available since the last hearing, but I don't  01:53PM
15  think any of the attorneys have made use of it.  Even if they  01:53PM
16  are aware of it, they don't -- they don't want to use it,  01:53PM
17  they'd rather stay in the other area, but it's available and  01:53PM
18  if they need it -- something more private, all they have to  01:53PM
19  say most of the time is just let us know "hey, I need a more  01:53PM
20  private room," then we can get that -- accommodate it.  01:53PM
21          THE COURT:  But let me just be clear that -- and  01:53PM
22  thank you, I appreciate your confirmation.  Let me just be  01:53PM
23  clear, that particular room that's called the attorney-client  01:53PM
24  room, that particular room is -- is that solely dedicated for  01:53PM
25  attorney-client meetings?  01:53PM

```
1       MR. AGUON:  Yes, Your Honor, that particular room    01:53PM
2   has been there ever since the building is built.  It's part of   01:53PM
3   the design of the building and it's always been there since   01:53PM
4   that building was built in 1998.  The thing is -- like   01:54PM
5   Attorney Schwab pointed out, that over the years not a lot of   01:54PM
6   people were using it and it kind of just got deteriorated and   01:54PM
7   it wasn't being used, but based on our last court hearing, we   01:54PM
8   went in there, renovated it, cleaned it all up, put a new air   01:54PM
9   con, cleaned up the leaks -- there were was leaking areas, we   01:54PM
10  fixed all that up and now that room is a hundred percent   01:54PM
11  available but even after that, some of the attorneys -- the   01:54PM
12  public defender there still doesn't want to go use it.  They'd   01:54PM
13  rather --   01:54PM
14      THE COURT:  We'll -- okay, well, good to know.   01:54PM
15  Thank you for telling me that.  All right.  So at the last   01:54PM
16  hearing, we were told that there were four different venues   01:54PM
17  for attorneys to meet.  So we have the attorney-client room,   01:54PM
18  what other room -- (echo.)   01:54PM
19      (Pause.)   01:54PM
20      THE DEFENDANT:  Your Honor?   01:54PM
21      THE COURT:  Yes?  Who's that?  Mr. Blas, you   01:55PM
22  wanted to say something?   01:55PM
23      THE DEFENDANT:  If I may, Your Honor?   01:55PM
24      THE COURT:  Mr. Razzano, is it okay if your   01:55PM
25  client speaks?  I'm sorry, Mr. Razzano?   01:55PM
```

01:55PM
1          MR. RAZZANO:  That's okay with me.

01:55PM
2          THE COURT:  Mr. Blas, you may speak.

01:55PM
3          THE DEFENDANT:  Thank you, Your Honor.  Your

01:55PM
4  Honor, in response to Major Aguon, with respect to the

01:55PM
5  sanitation.  I live in my block every day.  If you were to

01:55PM
6  walk in there right now, you're going to find the shower

01:55PM
7  curtain, which is made of cloth, it's covered with bacteria.

01:55PM
8  It's stuck to the cloth.  You're going to find a bar of Ivory

01:55PM
9  soap that is overused and hasn't been replenished and is not

01:56PM
10  done on a daily basis.  You're going to find those things that

01:56PM
11  is unsanitary.  I stay int his -- on the block area and I

01:56PM
12  share it with all the other detainees, but with regard to

01:56PM
13  sanitation, that is not completely accurate with respect to

01:56PM
14  him saying it's being done on a daily basis.  It is not.

01:56PM
15          THE COURT:  Okay.  All right.  Thank you for your

01:56PM
16  comment, Mr. -- thank you for your comment, Mr. Blas.

01:56PM
17  Anything further?

01:56PM
18          THE DEFENDANT:  The last time I got a mask was in

01:56PM
19  early April, that was the last time I got a mask.  The mask

01:56PM
20  that I'm wearing now is broken and I have to tie the straps

01:56PM
21  just to keep it in my -- keep it on my ear.  I have to tie it

01:56PM
22  because it's broken twice already.  It hasn't been replaced

01:56PM
23  since that time.  There is no -- there is no sanitation such

01:57PM
24  as bleach or hand gel for any of the detainees.  There's

01:57PM
25  nothing.  There has never been even till this day.  There's

1   nothing that would be used to sanitize our rooms or our cells    01:57PM

2   other than water and Ivory soap.    01:57PM

3            THE COURT:  Uh-huh.  You mean like -- I'm sorry,    01:57PM

4   but are you saying that all the -- (echo) -- detainees solely    01:57PM

5   use one bar of soap like together?    01:57PM

6            THE DEFENDANT:  I'm sorry, Your Honor, I didn't    01:57PM

7   hear you.    01:57PM

8            THE COURT:  Did you just say that one bar of soap    01:57PM

9   is being utilized by all the detainees in the Hagatna    01:57PM

10  detention center, you guys share that?    01:57PM

11           THE DEFENDANT:  What happens, Your Honor, is the    01:57PM

12  bar of soap, it's broken in three parts, and that's how it's    01:57PM

13  divided.    01:57PM

14           THE COURT:  So you guys share three parts of the    01:57PM

15  Ivory soap that's shared amongst all the detainees?    01:58PM

16           THE DEFENDANT:  That's correct, Your Honor.    01:58PM

17           THE COURT:  Okay.  All right.  Okay.  So let's go    01:58PM

18  on to the second room.  There's supposed to be four different    01:58PM

19  venues -- potential venues for an attorney to meet with his    01:58PM

20  client.  We saw the first one.    01:58PM

21           Ms. Muna, is there a second, third, or fourth    01:58PM

22  one?  (No response.)  Okay.  Let's see where are we going    01:58PM

23  here, we're going down the hallway?    01:58PM

24           (Pause.)    01:58PM

25           THE COURT:  I'm sorry, Ms. Muna, we can't hear    01:58PM

1   you.                                                          01:58PM

2           MARSHAL MUNA:  Sorry, this is a gate on the           01:58PM

3   prisoner side of the room, so this gate doubles as another    01:58PM

4   room where the attorney and client can meet in private.  So   01:59PM

5   it's 11 feet from that wall to that wall -- or 11 tiles.      01:59PM

6   They're one foot tiles, so...                                 01:59PM

7           THE COURT:  All right.  So this is the prisoner       01:59PM

8   side of the same attorney-client room that you're talking --  01:59PM

9   room that you're talking about?                               01:59PM

10          MARSHAL MUNA:  Yeah, and the door can close, so       01:59PM

11  it's private.                                                 01:59PM

12          THE COURT:  I see, okay.  We're still on venue        01:59PM

13  number one?  Okay.  Go ahead.                                 01:59PM

14          MARSHAL MUNA:  Yeah, so the other place is the        01:59PM

15  pavilion.  I can walk out there right now.                    01:59PM

16          THE COURT:  Okay.  Yeah, sure, I'd like to see        01:59PM

17  it.  The second is the pavilion.  Is that the only open venue? 01:59PM

18          MARSHAL MUNA:  Yes.  Standby.  I muted the video.     01:59PM

19          THE COURT:  Okay.  Very well.                         01:59PM

20              (Background voices at prison.)                    02:00PM

21          THE COURT:  We're still waiting for her; right?       02:00PM

22          MARSHAL MUNA:  Your Honor, this is Tanya.  This       02:01PM

23  is the pavilion area.                                         02:01PM

24          THE COURT:  I see, the pavilion.  Okay.  This is      02:01PM

25  venue two.  So this is located where?  I have been there, I'm 02:01PM

```
1    just trying to get my bearings here.                          02:01PM

2              MARSHAL MUNA:  The entrance is over this             02:01PM

3    (indicating).                                                 02:01PM

4              THE COURT:  I see.  Okay.                            02:01PM

5              (Pause.)                                             02:01PM

6              MARSHAL MUNA:  So this is the main entrance.         02:01PM

7              THE COURT:  I see.  Okay.  Yeah, I remember this     02:01PM

8    entrance.  Okay.  So --                                       02:01PM

9              MARSHAL MUNA:  So that --                            02:01PM

10             THE COURT:  This is the pavilion here?               02:01PM

11             MARSHAL MUNA:  Yes.  Yeah, so -- and the pavilion    02:01PM

12   is right through those -- that's where most people are        02:01PM

13   familiar with.                                                02:02PM

14             THE COURT:  But it's outdoors; right?  It looks      02:02PM

15   like an outdoor patio, attorney's will be outside and --      02:02PM

16   Mr. Razzano, are you familiar with that outdoor pavilion      02:02PM

17   patio?                                                        02:02PM

18             MR. RAZZANO:  Yes, Your Honor, I'm very familiar.    02:02PM

19   This is where we referred to in our motion as the yard.  And  02:02PM

20   this is where you get stuck sitting out on those -- I guess   02:02PM

21   you can call them picnic table benches and, generally, you    02:02PM

22   meet with your client while all the other inmates are out     02:02PM

23   there with their families.  Now, I understand that that might 02:02PM

24   not be the case now because there's no visitation allowed but 02:02PM

25   historically, you know, you meet with your client outside     02:02PM
```

1    amongst, you know, however many family members and children    02:02PM

2    are, you know, there that day, if you're there on a visitation    02:02PM

3    day.    02:02PM

4            THE COURT:  Yeah.  Okay.  So this is called the    02:02PM

5    yard or the pavilion.  Okay.  Can you -- Ms. Muna, can you do    02:02PM

6    me a favor, can you zoom in around there?  Let me just look at    02:03PM

7    the picnic tables and stuff that he's talking about.  First of    02:03PM

8    all, how many picnic tables are there, because Mr. Razzano    02:03PM

9    says that not only will he be speaking to his client, but it    02:03PM

10   could also very well be that families are visiting.    02:03PM

11           MARSHAL MUNA:  But there's another picnic table.    02:03PM

12           THE COURT:  Wow, so that's pretty -- I didn't    02:03PM

13   realize that.  I didn't know there was that many picnic    02:03PM

14   tables.  Okay.  And is there no -- am I to assume there's no    02:03PM

15   visitation now because of the COVID outbreak; is that correct?    02:03PM

16           MARSHAL MUNA:  Your Honor -- go ahead.    02:03PM

17           MS. SAMBATARO:  I was going to just say DOC did    02:03PM

18   inform us that non-attorney visitation is still suspended    02:03PM

19   right now.    02:03PM

20           THE COURT:  I'm sorry.  What was that, Ms.    02:03PM

21   Sambataro?    02:03PM

22           MS. SAMBATARO:  DOC -- Major Aguon and other DOC    02:03PM

23   personnel who've met with us and Mr. Razzano yesterday in the    02:04PM

24   U.S. attorney's office did say that non-attorney visitation is    02:04PM

25   still suspended, so there's no non-attorney visitors coming    02:04PM

1   into that facility at this time.                               02:04PM

2          THE COURT:  Okay.  Very well.                           02:04PM

3          (Pause.)                                                02:04PM

4          MARSHAL MUNA:  So this last place I'm going to          02:04PM

5   take you to is the other area where they do the video         02:04PM

6   conferencing for the locals but I'm going to mute the video   02:04PM

7   for a second here.                                            02:04PM

8          THE COURT:  Now we're going go to venue three,          02:04PM

9   okay, venue three.  Okay, we'll give her --                   02:04PM

10         MR. RAZZANO:  Your Honor, I'd ask that she              02:04PM

11  doesn't mute the video so you can see where you have to walk  02:04PM

12  through to get to that room.  You basically have to go through 02:04PM

13  general population, where I'm going be asked to be subjected   02:04PM

14  to multiple human beings in the cells, so she puts the camera 02:04PM

15  to the right-hand side as she walks through the door, you're  02:05PM

16  going to see the general population with people incarcerated  02:05PM

17  on top of each other.  So I think we should go back and show  02:05PM

18  you that, so you can see what that looks like.                02:05PM

19         MARSHAL MUNA:  Your Honor, that's true.  It's           02:05PM

20  just that there's prisoners in here, so...                    02:05PM

21         THE COURT:  Okay.  You wanted to protect their         02:05PM

22  identities, is that it?                                       02:05PM

23         MARSHAL MUNA:  Yeah, I just asked permission to         02:05PM

24  come in this area.  I did make arrangements to come in this   02:05PM

25  area in advance.                                              02:05PM

 1          THE COURT:  Well, okay, so -- you can see that,          02:05PM

 2   Mr. Razzano, so because of privacy issues I won't ask her to   02:05PM

 3   video that, but she could see that you're correct, that it     02:05PM

 4   would entail you or any other attorney to have to walk through 02:05PM

 5   general population.  All right.  So I mean, if I had a chance   02:05PM

 6   to go down there and view it myself, I would, but I do         02:05PM

 7   remember the facility.  I've gone down there.  I think         02:05PM

 8   Mr. Schwab and I went there maybe a year ago or so, a couple   02:06PM

 9   of years ago, when the settlement agreement was in place, and  02:06PM

10   we took a tour.  Okay, so this is venue three, Ms. Muna?       02:06PM

11          MARSHAL MUNA:  Hi, Your Honor.  Let me mute the         02:06PM

12   audio on the video for a second.                               02:06PM

13          THE COURT:  Okay.  What did she say?                    02:06PM

14          (Pause.)                                                02:06PM

15          MARSHAL MUNA:  So -- so we're gonna -- I'm going        02:06PM

16   to mute the video because we're at the secure door, so he's    02:06PM

17   going to take us to the old Hagatna precinct that's being      02:06PM

18   renovated to be multipurpose use, so one second.              02:06PM

19          THE COURT:  I'm sorry, is this venue three or           02:06PM

20   venue four, excuse me?                                         02:06PM

21          MS. SAMBATARO:  Venue four.                             02:06PM

22          THE COURT:  Four, okay.  We'll give her a few           02:07PM

23   minutes.  I'm going to get my water over here.                 02:07PM

24          MR. RAZZANO:  Judge, are we just giving up on           02:07PM

25   venue three?                                                   02:07PM

| | | |
|---|---|---|
| 1 | THE COURT: I don't know. I've got to ask her. | 02:07PM |
| 2 | I'm confused. Wait till she comes back on. | 02:07PM |
| 3 | MS. SAMBATARO: Didn't we just see venue three? | 02:07PM |
| 4 | MR. SCHWAB: Yeah. | 02:07PM |
| 5 | THE COURT: Yeah, I thought so but I don't know. | 02:07PM |
| 6 | I'm kind of confused. | 02:07PM |
| 7 | MS. SAMBATARO: My understanding was that was the | 02:07PM |
| 8 | video conference area that they used for bail hearings in the | 02:07PM |
| 9 | Superior Court of Guam. | 02:07PM |
| 10 | MARSHAL MUNA: Hi, Your Honor, this is -- this is | 02:07PM |
| 11 | -- oh, the -- this is the room that will start renovation | 02:07PM |
| 12 | tomorrow that has direct access to the prison area, away from | 02:07PM |
| 13 | the housing unit, so it is -- this room is going to be | 02:07PM |
| 14 | renovated. | 02:08PM |
| 15 | THE COURT: This is venue four? | 02:08PM |
| 16 | LT. ESPINO: There's three proposed -- | 02:08PM |
| 17 | MARSHAL MUNA: I guess this will be the fourth | 02:08PM |
| 18 | area, Your Honor. | 02:08PM |
| 19 | THE COURT: Uh-huh. And I'm sorry, this is going | 02:08PM |
| 20 | to be renovated, is that what you said? | 02:08PM |
| 21 | MARSHAL MUNA: Yeah, according to Lieutenant | 02:08PM |
| 22 | Espino, the renovation is starting tomorrow. | 02:08PM |
| 23 | THE COURT: This is a renovation for what | 02:08PM |
| 24 | exactly? I'm sorry. | 02:08PM |
| 25 | MARSHAL MUNA: The old Hagatna precinct. | 02:08PM |

1    THE COURT:  But is this -- what -- is this going    02:08PM

2    to be another attorney-client access room or not?    02:08PM

3    MARSHAL MUNA:  Yes, according to Lieutenant    02:08PM

4    Espino, yes, they're going to renovate to do so.    02:08PM

5    THE COURT:  So why are they going to renovate    02:08PM

6    that if they already have venue number one in place?    02:08PM

7    MARSHAL MUNA:  For the locals, but it's an    02:08PM

8    option.    02:08PM

9    THE COURT:  Okay.  Which one is for the locals    02:08PM

10   and which one -- is there a difference between the local    02:08PM

11   detainees and a federal detainee?    02:08PM

12   MARSHAL MUNA:  The federal side is on the other    02:09PM

13   side, the one with the window that I showed you.    02:09PM

14   THE COURT:  So number one is for the federal,    02:09PM

15   that's for the federal detainees?    02:09PM

16   MARSHAL MUNA:  Yeah.  You asked about all the    02:09PM

17   options, so that's why I was showing you the options.    02:09PM

18   THE COURT:  All right.  Thank you.  So venue one,    02:09PM

19   venue two, venue three are the options just for the federal    02:09PM

20   detainees, correct, is that a fair statement?    02:09PM

21   MARSHAL MUNA:  Yeah.  I guess the third option is    02:09PM

22   an option but that's the option that we have to go through    02:09PM

23   that you can --    02:09PM

24   THE COURT:  Okay.  Can you go back to venue --    02:09PM

25   okay, so venue four is not really available to the feds so    02:09PM

1    we'll disregard that.  Could you go back to venue three, me    02:09PM

2    and Mr. Razzano were just a little confused about that.  Is    02:09PM

3    that where the -- correct me if I'm wrong, is that where the    02:09PM

4    VTC setup is for the local court magistrate hearings?    02:09PM

5                MARSHAL MUNA:  Yes.    02:10PM

6                THE COURT:  Okay.  Can you take me back there    02:10PM

7    please?    02:10PM

8                MARSHAL MUNA:  Okay.  I'm going to pause the    02:10PM

9    video real quick.    02:10PM

10                THE COURT:  Okay.  Thank you.    02:10PM

11                (Pause.)    02:10PM

12                THE COURT:  Oh, I thought, also, too, didn't they    02:10PM

13    say that the commander's office was available?    02:10PM

14                MARSHAL MUNA:  Your Honor, maybe you can address    02:10PM

15    that to Major Aguon.    02:10PM

16                THE COURT:  Well, let's go to venue three first.    02:10PM

17    We'll finish up venue three, the VTC, I just want to see what    02:10PM

18    it looks like too.  I always see it on TV, you know, it looks    02:10PM

19    like they're in a cage.  Anyway...    02:10PM

20                (Pause.)    02:11PM

21                THE COURT:  Okay, I see.  We're approaching venue    02:11PM

22    three; is that correct, Ms. Muna?    02:11PM

23                MARSHAL MUNA:  Yes.    02:11PM

24                THE COURT:  So sometimes they allow attorney and    02:11PM

25    clients to go in there when it's not being -- in usage; is    02:11PM

1    that correct?                                                    02:11PM

2              MARSHAL MUNA:  Yes, according to Lieutenant            02:11PM

3    Espino.                                                          02:11PM

4              THE COURT:  Okay.  Any questions, Mr. Razzano, on      02:11PM

5    venue three?                                                     02:11PM

6              MR. RAZZANO:  Yeah, judge, I do.  Thank you.  Ms.      02:11PM

7    Muna, how big is that room, do you think, from end to end?       02:11PM

8              MARSHAL MUNA:  That's about nine-and-a-half feet.      02:11PM

9              MR. RAZZANO:  Do you see where that issue is,          02:12PM

10   judge?  Generally, there's -- anywhere and there's almost a --   02:12PM

11   today there's no table in there.  There's almost never any       02:12PM

12   chairs in there.  And I think you could tell Mr. -- ask          02:12PM

13   Mr. Blas, we've had several meetings in that room where I have   02:12PM

14   to stand and then he sits, and then, also, Ms. Muna could you    02:12PM

15   show the judge the door?  Did you show her the door?  Because    02:12PM

16   there's generally no doorhandle on that door.  Yeah.  Do you     02:12PM

17   see that, Your Honor?  There's no doorhandle on that door.       02:12PM

18              THE COURT:  Okay.                                     02:12PM

19              MR. RAZZANO:  No, you see -- it didn't close.         02:12PM

20   There's also a craft room in there, can you show the judge       02:12PM

21   that?  That's where the other inmates use the facility.          02:13PM

22              MARSHAL MUNA:  According to the officer, this is      02:13PM

23   an electronic locking door.                                      02:13PM

24              MR. RAZZANO:  When was that installed?               02:13PM

25              (Pause.)                                              02:13PM

|     |                                                              |        |
|-----|--------------------------------------------------------------|--------|
| 1   | MARSHAL MUNA:  So that door was just locked.                 | 02:13PM |
| 2   | MR. RAZZANO:  Okay.  The question is when was                | 02:13PM |
| 3   | that installed?                                              | 02:13PM |
| 4   | MARSHAL MUNA:  Yeah.                                         | 02:13PM |
| 5   | THE COURT:  I'm sorry, what did he say?                      | 02:13PM |
| 6   | MARSHAL MUNA:  He said the lock has been here                | 02:13PM |
| 7   | ever since I started here.                                   | 02:13PM |
| 8   | THE COURT:  Which is when?                                   | 02:13PM |
| 9   | MR. RAZZANO:  Which is -- yeah.  Thank you.                  | 02:13PM |
| 10  | MARSHAL MUNA:  He said he assumed command here               | 02:13PM |
| 11  | three or four years ago.                                     | 02:13PM |
| 12  | MR. RAZZANO:  That is far from the truth and I               | 02:13PM |
| 13  | could put Ms. Travis on the stand to testify how we meet in  | 02:13PM |
| 14  | that room.  So that -- I submit to you, Your Honor, that is  | 02:13PM |
| 15  | not true.                                                    | 02:13PM |
| 16  | THE COURT:  Okay.  All right.  Well, okay, so                | 02:14PM |
| 17  | then you -- any other questions on venue three?             | 02:14PM |
| 18  | MR. RAZZANO:  No further.  Thank you, Your Honor.           | 02:14PM |
| 19  | THE COURT:  Um, Ms. Sambataro, do you have any               | 02:14PM |
| 20  | questions on venue three?                                    | 02:14PM |
| 21  | MS. SAMBATARO:  Um, I would just ask -- so if an             | 02:14PM |
| 22  | attorney had specific needs with regard to tables, chairs,   | 02:14PM |
| 23  | technology, would the DOC be willing to accommodate those    | 02:14PM |
| 24  | requests?                                                    | 02:14PM |
| 25  | MARSHAL MUNA:  Yes.  According to Lieutenant                 | 02:14PM |

*Criminal Case No. 19-00036, USA v. Blas*

```
1    Espino, yes.  Arrangements should be made in advance if they      02:14PM
2    need any extra special accommodations.                            02:14PM
3                 MS. SAMBATARO:  And that was in line with --          02:14PM
4    Major Aguon, that's in line with what you informed us             02:14PM
5    yesterday; is that correct?                                       02:14PM
6                 MR. AGUON:  Yes.  Yes.  This is Major Aguon.         02:14PM
7                 MARSHAL MUNA:  This room is 10 by -- this room is    02:14PM
8    10 by 13.                                                         02:14PM
9                 (Pause.)                                             02:14PM
10                THE COURT:  So let me just ask:  Major Aguon, or     02:15PM
11   whoever can answer the question, is there one room, an           02:15PM
12   attorney-client room, that is readily available at all times     02:15PM
13   with sanitized chairs, tables, any other type of equipment       02:15PM
14   that might be needed that's reasonable?  Is there a room          02:15PM
15   that's totally dedicated that's always available for the         02:15PM
16   lawyers?                                                          02:15PM
17                LT. ESPINO:  Yes, Your Honor.                        02:15PM
18                MARSHAL MUNA:  This is Lieutenant Espino and he's    02:15PM
19   speaking with me.                                                 02:15PM
20                THE COURT:  Lieutenant Espino, is that room venue    02:15PM
21   one?  I'm only talking about the federal detention detainees     02:15PM
22   because that's all I have jurisdiction over.  Is that the very   02:15PM
23   first room that you -- that was shown to us?                      02:15PM
24                LT. ESPINO:  Yes, Your Honor, this is local --       02:15PM
25                THE COURT:  Excuse me?                               02:15PM
```

02:15PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:16PM
02:17PM
02:17PM
02:17PM
02:17PM
02:17PM
02:17PM
02:17PM

1          MARSHAL MUNA:  It's a local holding facility

2    because you asked if he's in the area, but the other area is

3    only available --

4          THE COURT:  I'm sorry, Tanya, Ms. Muna, I can't

5    hear you.  Sorry.  Can you -- what did you say, Ms. Muna?  You

6    weren't clear.

7          MR. ESPINO:  Your Honor, there's three rooms for

8    attorney conference room with table and chairs.  If you need

9    more chairs, I can provide more chairs.

10          THE COURT:  Okay.  So if the attorneys need -- if

11    the attorneys need more things, okay, it sounds like you guys

12    are ready to help them.  So we have the attorney-client room

13    with air conditioning in it.  It's a private room, according

14    to you guys, I saw that.  It's 11 by 12 feet, it sounds like.

15    And then they would have attorney -- I mean, then a second

16    room that's available for attorneys is venue two, the pavilion

17    or the outdoor patio or the yard, as Mr. Razzano calls it,

18    picnic tables, there doesn't seem like there's very much

19    privacy there, especially if there's family visits, and then

20    venue three is really dedicated more to the magistrate -- for

21    the magistrate video teleconference hearings, but that -- that

22    is available to lawyers.  So -- so do you normally take -- I

23    guess, Mr. Espino -- or I'm sorry, what is your position,

24    Lieutenant Espino?  Do you -- do both of the attorneys go

25    directly to venue number one, attorney-client room number one,

```
 1   if they want to speak to their client?                    02:17PM

 2           MR. ESPINO:  The only thing we ask is if they can  02:17PM

 3   -- you know, they can walk in at any time during business  02:17PM

 4   hours, but we appreciate if they can call us in advance so we 02:17PM

 5   can secure the place for them.  Sometimes they walk in all at 02:17PM

 6   the same time.                                             02:17PM

 7           THE COURT:  Right.  Okay.  So you just want it to  02:17PM

 8   be scheduled?  Yeah.  Okay, that makes sense, to be more -- 02:17PM

 9   okay.  Any questions that you have, Mr. Razzano, with -- of 02:17PM

10   Lieutenant Espino?                                         02:18PM

11           MR. RAZZANO:  No, Your Honor.  Thank you.          02:18PM

12           THE COURT:  Ms. Sambataro?                         02:18PM

13           MS. SAMBATARO:  Um, so Lieutenant Espino, um, I    02:18PM

14   just want to confirm with you as well, from speaking with DOC, 02:18PM

15   you all have safeguards in place for people entering the   02:18PM

16   facility, including attorneys; is that correct?            02:18PM

17           LT. ESPINO:  Yes, Your Honor, but like I said, we  02:18PM

18   can be more ready if they give us an advanced notification. 02:18PM

19   Because we have a lot of open space for the local prisoners, 02:18PM

20   but they can walk in any time now but we prefer advanced   02:18PM

21   notice.                                                    02:18PM

22           MS. SAMBATARO:  They just have to go through a     02:18PM

23   temperature check; is that correct?                        02:18PM

24           MR. ESPINO:  Yes, Your Honor, COVID-19             02:18PM

25   precautionary.                                             02:18PM
```

|   |   |   |
|---|---|---|
| 1 | MS. SAMBATARO:  And a house questionnaire as | 02:18PM |
| 2 | well; correct? | 02:18PM |
| 3 | LT. ESPINO:  Yes, Your Honor.  Plus, we do have, | 02:18PM |
| 4 | also, the isolation room, there's no contact, we cannot be | 02:18PM |
| 5 | held for that if the attorney prefer not to -- at the time. | 02:19PM |
| 6 | MS. SAMBATARO:  Okay.  Thank you.  I have nothing | 02:19PM |
| 7 | further, Your Honor. | 02:19PM |
| 8 | THE COURT:  Okay.  So now I understand the | 02:19PM |
| 9 | venues.  All right.  So let me ask:  Who is here for DOC that | 02:19PM |
| 10 | we have -- can you just identify your name for the record and | 02:19PM |
| 11 | your position so I make sure I have everybody right.  I know I | 02:19PM |
| 12 | do have judicial inspector, U.S. Marshals Tanya Muna, and John | 02:19PM |
| 13 | Untalan from the U.S. feds.  How about from the local DOC? | 02:19PM |
| 14 | MR. AGUON:  Your Honor, Major Antoine Aguon is | 02:19PM |
| 15 | here. | 02:19PM |
| 16 | THE COURT:  Okay. | 02:19PM |
| 17 | DR. TAIMANGLO:  Hello? | 02:19PM |
| 18 | (Pause.) | 02:19PM |
| 19 | DR. TAIMANGLO:  Patricia Taimanglo, by phone. | 02:19PM |
| 20 | THE COURT:  I'm sorry, who is this? | 02:20PM |
| 21 | DR. TAIMANGLO:  Dr. Patricia Taimanglo, clinical | 02:20PM |
| 22 | psychologist from the Department of Corrections. | 02:20PM |
| 23 | THE COURT:  Oh, okay, Dr. Patricia.  Okay, hi, | 02:20PM |
| 24 | Dr. Taimanglo? | 02:20PM |
| 25 | DR. TAIMANGLO:  Hi.  Hafa adai. | 02:20PM |

*Criminal Case No. 19-00036, USA v. Blas*

THE COURT:  And who else -- I'm sorry.  Anybody

else --

MARSHAL MUNA:  Lieutenant Arsenio Espino, he was

the one speaking earlier.

THE COURT:  Lieutenant Espino, okay.  Anyone else

from the DOC detention?  Nobody else, okay.  All right.  So

now we've gone through the venues.  So the one thing -- okay,

are there any other questions on the venues then, Mr. Razzano,

or do you have anything further?

MR. RAZZANO:  No, nothing further, Your Honor.

Thank you.

THE COURT:  Ms. Sambataro, Mr. Schwab, do you

guys have any -- do you-all have anything further?

MS. SAMBATARO:  Your Honor, also, just note that

apparently a letter was sent from Mr. Gorman to the CJA panel

informing them of options for attorney-client access at DOC

and apparently, per Major Aguon, they've even accommodated

Mr. Gorman with regards to facilitating communications

specifically for him and his client in a secure manner and so

-- yeah, there's a headset, but essentially, what we really

got the impression of was that DOC really is willing to work

with the defense bar, they just have to be asked, and it seems

like instead of asking in these proceedings, when they could

perhaps avoid that altogether if the marshals are alerted

ahead of time or DOC was asked because every time they're

1   asked, they're responsive and they indicate a willingness to   02:21PM

2   accommodate.  And that -- we saw that yesterday when they met   02:21PM

3   with us.   02:21PM

4           THE COURT:  Yeah.   02:21PM

5           MS. SAMBATARO:  So I think --   02:21PM

6           THE COURT:  Yeah, I don't doubt that.  I think   02:21PM

7   that it's been clear when we had -- a federal public defender   02:21PM

8   has come in and triple teamed you there, Ms. Sambataro, a few   02:21PM

9   weeks ago, and they were just ready, willing, and able to want   02:22PM

10  to assist.  Even though the Court, you know, found that that   02:22PM

11  particular matter of medical attention really should be   02:22PM

12  probably handled -- well, it should be handled in a civil   02:22PM

13  proceeding as opposed to a criminal proceeding, I think   02:22PM

14  everybody agreed with that, notwithstanding though, everybody   02:22PM

15  got together, the United States federal government and the   02:22PM

16  prosecutor here, your office, and the federal public defender   02:22PM

17  worked closely with the detention center to try to resolve   02:22PM

18  that, all of the medical issues.   02:22PM

19          Okay.  Mr. Razzano, anything further?   02:22PM

20          MR. RAZZANO:  No, not on those issues, Your   02:22PM

21  Honor.  Thank you.   02:22PM

22          THE COURT:  Okay, any other issues now that we   02:22PM

23  have -- yeah, any other issues, or can Ms. -- yeah, can Ms. --   02:22PM

24  or the marshal then go ahead and be excused?  She's down   02:22PM

25  there, giving us a live tour.   02:22PM

|   |   |   |
|---|---|---|
| 1 | MR. RAZZANO:  Yeah, that'll be fine. | 02:23PM |
| 2 | THE COURT:  Thank you, Ms. Muna. | 02:23PM |
| 3 | MS. SAMBATARO:  Thank you. | 02:23PM |
| 4 | THE COURT:  Okay.  All right.  Go ahead, | 02:23PM |
| 5 | Mr. Razzano.  What other issues, sir? | 02:23PM |
| 6 | MR. RAZZANO:  Your Honor, so we have Stacey | 02:23PM |
| 7 | Coletta here today and Beau Blas who have both gone through | 02:23PM |
| 8 | the rigorous inspection process to be third-party custodians | 02:23PM |
| 9 | and I think you have a report that was written by Ms. | 02:23PM |
| 10 | Yamashita on May 26th to you regarding the qualifications of | 02:23PM |
| 11 | third-party custodians, and the office of United States | 02:23PM |
| 12 | Probation is recommending release for Mr. Blas at this time | 02:23PM |
| 13 | with certain conditions that were attached to the letter to | 02:23PM |
| 14 | Your Honor, which we have no objection to any of those | 02:23PM |
| 15 | conditions, and we would like to have Mr. Blas released, | 02:23PM |
| 16 | pending his sentencing. | 02:23PM |
| 17 | THE COURT:  Okay.  Let me hear -- okay, so are | 02:24PM |
| 18 | you asking me to base his release on the fact that you don't | 02:24PM |
| 19 | have, um -- okay, what exactly are you asking me to -- why are | 02:24PM |
| 20 | you asking me to release Mr. Blas at this point, especially | 02:24PM |
| 21 | after -- after the tour that we just received? | 02:24PM |
| 22 | MR. RAZZANO:  Yes, judge.  I'm not going to ask | 02:24PM |
| 23 | you to relitigate the issues that you've already decided.  I | 02:24PM |
| 24 | respect the Court's order, as I told you the last time. | 02:24PM |
| 25 | THE COURT:  Yeah. | 02:24PM |

          MR. RAZZANO:  But with respect to the risks that
you just saw that I would have to take personally in order to
prepare properly for his sentencing, it's not reasonable
during this particular pandemic.  I mean, it's obvious that
there's a problem with humans getting together too many at a
time.  None of us are together today.  I'm appearing in
federal court on a TV screen because those of us who have
known each other for years and years and years are concerned
about being in the same courtroom together where there's no
question that we could be spaced six feet apart, so it's not
reasonable for an attorney to have to put himself and his
family at risk in order to satisfy the needs of his client.

          More than that, Mr. Blas is not incarcerated on a
violent crime.  He's incarcerated on, essentially, a white
collar crime.  He is not -- again, I'm not going to ask you to
relitigate the issues, but he really is not a danger to the
community and he's going to be in his house, with his family,
practicing social distancing, which he cannot do today.

          You heard testimony from Mr. Blas about his
health on last week, you heard about the mask situation today,
and I -- that's probably going on with every single inmate.
Ms. Muna admitted to you that if she had shown you -- now, I
don't doubt that she's protecting people's privacy, but the
reality is if the camera had gone to the right-hand side when
we looked at venue number three, you're going to see four and

five and six people in a cell together.  That is not social
distancing and, quite honestly, it's not safe.  I understand
from our meeting yesterday, and I don't deny that Major Aguon
is doing the absolute best that he can, and under the
circumstances and under the budget constraints of the
government of Guam, I applaud his efforts.  Nevertheless,
COVID is going to be in that jail.  If it's not today, maybe
it's not tomorrow, but it's gonna happen.  And when it does,
it's going to spread, and I should not have to be put at risk.
It's not fair.  I just lost everybody but -- can anyone see
me?

        THE COURT:  Yeah, we can see you.  I can see you,
I can hear you.

        MR. RAZZANO:  All right.  Well, anyway, I can't
see any of you but -- there it is, okay.  But anyway, I think
those things and the fact that the United States Probation
Office has recognized that he's not -- he's not a danger and
he's not a risk and they think that there's an adequate order
that could be put together in order to release him, provides
Mr. Blas with the opportunity to meet with me anytime he
wants, unfettered, in a venue that we know is safe, and
further to that, he can take care of his own personal medical
needs, which needs to be addressed by this Court at
sentencing.  No question, Mr. Blas is going to be sentenced.
There's no doubt additional time and there's also no question

```
 1    he's going be sent off island, possibly to a facility that      02:27PM
 2    COVID will exist.  The man has diabetes.  It's a form of         02:28PM
 3    comorbidity and so it is going to be problem for him in the      02:28PM
 4    future.                                                          02:28PM
 5              In fact, yesterday, Major Aguon told us -- and I       02:28PM
 6    was sad to hear this, I didn't know this, 30 members of the      02:28PM
 7    Bureau of Prisons have died of COVID-19, so that means it's in   02:28PM
 8    our federal prison system and that's where Mr. Blas is headed    02:28PM
 9    eventually.  We don't know how much time he's going to be        02:28PM
10    there but that will be determined at sentencing.  I don't see    02:28PM
11    any prejudice or any problem to the United States with           02:28PM
12    allowing this man to prepare properly and -- and in accordance   02:28PM
13    with the attorney's ethical responsibilities to get ready to     02:28PM
14    put on the best sentencing that he possibly can.  Thank you,     02:28PM
15    Your Honor.                                                      02:28PM
16              THE COURT:  Okay.  Before we hear from Ms.             02:28PM
17    Sambataro, let me just say, what I did this weekend, on          02:28PM
18    Saturday, I took advantage of an invitation that I received --   02:28PM
19    and actually every federal judge received, every federal         02:29PM
20    judge, chief judge, every federal judicial clerk, and judicial   02:29PM
21    executive, including judiciary unit and secondary, probation     02:29PM
22    and pretrial officers, basically, we received an invitation      02:29PM
23    from the United States House of Representatives, and they        02:29PM
24    invited us to a virtual roundtable on COVID-19 in the prisons    02:29PM
25    and jails.  And so I listened to that particular roundtable by   02:29PM
```

telephone and, um, it was actually sponsored by -- it was sent

to us -- it was sponsored by the house democrats and they held

a roundtable to discuss the administration's inadequate --

that's what they called it, I'm not -- I'm not commenting on

what I think is -- this is just the way they sent it to us.

They said they're going to have a virtual roundtable to

discuss the Trump administration's inadequate response to the

COVID-19 pandemic and the impact of COVID-19 in prisons and

jails.  House judiciary chairperson, Jerrold Nadler, based out

of New York, and Crime Subcommittee chair Karen Bass of

California, have written to the United States Department of

Justice, Federal Bureau of Prisons and the United States

Marshals, on five prior occasions regarding the Federal Bureau

of Prisons and the United States Marshals services handling of

the coronavirus.  To date, the members have only received one

substantive -- to date, the members say they've only received

one substantive, yet inadequate, response.

         During the roundtable, the members and

participants will discuss actions the Trump administration

must take to mitigate the spread of COVID-19 and to save lives

and they are expected -- they -- Chairman Nadler and Chair

Bass and the House Judiciary Committee were expected to

participate in the roundtable.  They did advise, for the

record, Angela Caldwell, she's the daughter of Thomas

Balsiger, who is prisoner at the La Tuna BOP camp in Anthony,

1   Texas, that he was 67 years old, he had advanced coronary

2   artery disease and suffered a heart attack last year, and on

3   April 14th, 2020 -- by the way, I did listen to her testify,

4   she -- on April 14th, 2020, she indicated that Mr. Balsiger

5   was one of about 50 people at the prison who were told that

6   they would be released to home confinement in 7 to 30 days.

7   The following week, all three -- all the three were told their

8   release orders had been rescinded because they did not, in

9   fact, qualify for release.

10         So on May 16, 2020, he was informed that he would

11  not be released to home confinement -- he was not given a

12  reason for that determination.  So that was just -- that was

13  presented to us, and Andrea James, the founder and executive

14  director of the National Council on Incarcerated Women and

15  Formerly Incarcerated Women, she works directly with persons

16  impacted by the COVID outbreak in the jails and prisons, she

17  also testified.  And David Patton, executive director and

18  attorney for the -- Attorney-in-Chief of the Federal Defenders

19  of New York since July 2011 testified.

20         So what they -- so what happened was the virtual

21  roundtable was streamed lived -- streamed live that day, on

22  Saturday -- Saturday morning at 6:00 a.m. and so -- and what

23  they -- what we learned was that the Bureau of Prisons manages

24  120 facilities across the United States and has contact with

25  1200 facilities housing -- there are 16,742 prisoners

including Jesse Blas.  As of May 19, 2020, COVID-19 has spread
to 49 Federal Bureau of Prisons facilities and 24 residential
re-entry centers with, which a prison had contact, and the
Bureau of Prisons has reported that 138,954 federal inmates in
Bureau of Prisons management institutions and 12,107 inmates
in community-based facilities -- they report that many
inmates.  They noted that they have more than 36,000 staffers
working for the Federal Bureau of Prisons, which by the way, I
didn't know all these statistics -- I mean, maybe I did but I
had to be reminded.  As of May 8th -- as of May 18th, 2020, so
just a few days ago, we were told there were at least 57
COVID-19 prisoner deaths, and actually on the day that I was
listening, it actually went up to 59, and those deaths were
for persons in custody with the Federal Bureau of Prisons.

Andrea Circle Bear died from COVID-19 in late
April, shortly after giving birth to her baby while on a
ventilator, after having been sentenced and transferred to a
federal prison during the height of the pandemic, and then we
were told that as of May 19th, 2020, there were 2,159 federal
inmates and 196 Bureau of Prisons staff who had confirmed
positive test results, and this does not reflect the total
number of Bureau of Prisons prisoners who are infected with
COVID-19; however, BOP does not have a copy of testing
regimen.  I am just reading from what was given to me as a
federal judge.  The -- we are also told that the U.S. Marshals

1    service, that they do not operate its own jail, but as we know

2    -- and Mr. Razzano, you've pointed this out and so have the

3    U.S. federal public defenders and so has Ms. Sambataro,

4    Mr. Schwab, when they've come into court, the U.S. Marshals

5    service contracts with approximately 1,200 state and local

6    government agencies, including the government of Guam, also

7    these facilities house detainees, including of course,

8    Mr. Blas.

9              At this given time, the United States Marshals

10   service is responsible for housing approximately 52,000

11   detainees in federal, state, local, and private jails

12   throughout the United States.  An additional 10,500

13   individuals are being held pretrial in Federal Bureau of

14   Prisons facilities.  As of -- on March 27th, 2020, the CARES

15   Act, it's called the Coronavirus Aid, Relief, and Economic

16   Security Act was signed into law and it gave the Federal

17   Bureau of Prisons new tools to reduce crowding in the Bureau

18   of Prisons facilities during the COVID-19 crisis, broad

19   authority to transfer prisoners into home treatment, or to

20   confinement -- home confinement, and according to the House of

21   Representatives, they feel that that's -- the Bureau of

22   Prisons has dramatically underutilized those tools.

23              Chairman Nadler and Subcommittee Chair Karen Bass

24   has repeatedly urged United States Attorney General Barr, the

25   Federal Bureau of Prisons and the United States Marshals

 1    service to please consider aggressive measures to reduce the

 2    spread of COVID-19 in prisoners in jail, and then they sent us

 3    a full list of letters signed by the House Judiciary Committee

 4    to various agencies and so I won't get into all that.  But

 5    anyway, so just so you know the backdrop of me coming into

 6    this second hearing.  This particular roundtable did occur

 7    just a few days ago, so it was very enlightening for me to

 8    hear that and I'm glad to have done that.  I wish all of you

 9    could have heard it but it was very good to have all the

10    federal judges invited and so forth, especially because we are

11    considering these issues.

12         Okay.  So, go ahead -- so, Ms. Sambataro -- Mr.

13    Razzano, are you done then?  If you are, then I'll have Ms.

14    Sambataro speak.

15         MR. RAZZANO:  Yes.  Thank you, Your Honor.

16         THE COURT:  Okay.  Ms. Sambataro?

17         MS. SAMBATARO:  Well, Your Honor, a number of

18    things.  When we met with Mr. Razzano on the day of the X-ray,

19    we did also address Mr. Blas's medical care.  Dr. Andersen,

20    who is the physician assigned to DOC, was here, along with the

21    entire DOC nursing staff because, as you remember last week,

22    Mr. Blas gave us a list of his medical conditions and the

23    degree to which, in his opinion, those were not being

24    addressed, but it's very clear in talking to Dr. Andersen that

25    that is not the case.  It appears that Mr. Blas, when he asks

1    for medical care, he receives it.  He disagrees with the care    02:38PM

2    he's given and, additionally, some of the issues he raised    02:38PM

3    were not raised with DOC and with the medical staff until last    02:38PM

4    week.  They have not been made ware of the CPAP issue and Dr.    02:38PM

5    Andersen that he's happy to work with Mr. Blas, he's happy to    02:38PM

6    send Mr. Blas to a sleep specialist.  He was just made aware    02:38PM

7    of that issue.  Same thing with regard to Mr. Blas's spine    02:38PM

8    issue.    02:38PM

9             With regards to Mr. Blas's medical conditions, he    02:38PM

10   says Mr. Blas's diabetes is under excellent control.  His    02:38PM

11   blood sugar is checked as medically indicated, which right now    02:38PM

12   is every three months.  Because diabetes -- some people do    02:38PM

13   need to check their blood sugar daily, some people don't, and    02:38PM

14   it's all about the degree to which it's under control.  Mr.    02:39PM

15   Blas is under control and, therefore, right now, the medical    02:39PM

16   indication is every three months.    02:39PM

17            THE COURT:  Hold on, Ms. Sambataro.  Mr. Blas --    02:39PM

18   okay.  Mr. Blas, are you okay?  Do you need to sit down?  Are    02:39PM

19   you all right?    02:39PM

20            THE DEFENDANT:  Yes, Your Honor, I'm just leaning    02:39PM

21   towards the speaker of this phone so I can hear.    02:39PM

22            THE COURT:  Oh, okay.  Okay.  Thank you.  I just    02:39PM

23   want to make sure because I saw you -- maybe we could try to    02:39PM

24   make that louder or, Ms. Sambataro, can you speak louder.  Get    02:39PM

25   closer to your -- okay.  Thank you.  I appreciate that Ms.    02:39PM

1    Sambataro.                                              02:39PM

2              MS. SAMBATARO:  And, Your Honor, with regard to    02:39PM

3    the high blood pressure, Dr. Andersen said that Mr. Blas just  02:39PM

4    saw his cardiologist on Friday, that is also within control.   02:39PM

5    With regards to the tendonitis, first of all, an X-ray is not  02:39PM

6    -- you cannot diagnosis tendonitis via X-ray, but second of    02:39PM

7    all, the tendonitis arose because Mr. Blas is doing burpees     02:40PM

8    and calf raises, so Dr. Andersen advised him to refrain from    02:40PM

9    doing that because it was creating a repetitive use injury.     02:40PM

10   According to Dr. Andersen, Mr. Blas's health is under control   02:40PM

11   and his heart is in good shape.  The outstanding issue is the   02:40PM

12   CPAP and neck and spine issue, which were just brought to the   02:40PM

13   medical staff's attention.  So from meeting with the medical    02:40PM

14   staff, it's apparent that they are responsive when issues are   02:40PM

15   brought to them.  It just might be that Mr. Blas does not like  02:40PM

16   the care that's given or agree with it but that does not mean   02:40PM

17   that it is insufficient care.                           02:40PM

18             With regards to COVID-19, specifically, Your     02:40PM

19   Honor, um, I think the situation with the BOP on the mainland  02:40PM

20   is very different from the situation we have here on Guam.  We  02:40PM

21   don't have a large-scale facility with a large number of       02:40PM

22   inmates and a large number of staff going in and out.  Just    02:41PM

23   like we're very lucky in that because we're an island, we have  02:41PM

24   some means of controlling it once you control community        02:41PM

25   spread.  Three, it's just using it because they can control    02:41PM

how people come on and off the island.  We have the agency to

control DOC in a way that BOP -- by sheer numbers and by sheer

volume, it's a distinctive situation, Your Honor.  It's

distinctive from the situation on the mainland and we have

heard from DOC that they are instituting sanitary measures.

They are instituting temperature checks, they isolate new

inmates from the general population for 14 days and actually

checks on the new inmates twice daily.  They have a quarantine

site in place and ready in the event of an outbreak.

And so, Your Honor -- so what we're hearing from

BOP, there are sanitary measures in place, there's a plan in

place in the event of an outbreak, and they are, in fact,

giving Mr. Blas adequate medical care, especially when they're

notified of issues.  The bottom line is that these are not

reasons to reverse three prior decisions denying the

defendant's release.  This is someone, as shown in the

numerous previous detention hearings, has a history of abusing

the system.  He abused his power at the Yona mayor's office,

he's on a recording bragging to his former girlfriend, who he

also admitted to choking --

MR. RAZZANO:  Your Honor, I'm going to have to

ask -- I mean, if Ms. Sambataro wants to relitigate all of

these issues about what the FBI said and have another

detention hearing where I told you I would not relitigate

those issues, I'm happy to have that hearing today, but are we

having that hearing today?                                         02:42PM

       THE COURT:  Okay, sustained.  Your objection is     02:42PM

sustained.  Ms. Sambataro, I denied the detention -- on -- as      02:42PM

you know, I already denied it.  The only concern I have was --     02:43PM

biggest concern I had was all medical issues and the next          02:43PM

biggest concern, which is probably the concern that I should       02:43PM

be really concerned about is -- in my criminal court is the        02:43PM

access to his lawyer, but let me just ask -- Dr. Patricia          02:43PM

Taimanglo is on the line for a reason.  I do recall now that       02:43PM

Mr. Blas was suffering from depression and he was trying to        02:43PM

get assistance, is that what why Dr. Taimanglo, you're on the      02:43PM

line, to assist us, to enlighten us about that?                    02:43PM

       DR. TAIMANGLO:  I was asked by Major Aguon to       02:43PM

participate and that's why I'm on line.  Um, I just want to be     02:43PM

mindful that I don't have written consent from my client.         02:43PM

       THE COURT:  Oh, I see.                               02:44PM

       DR. TAIMANGLO:  DOC is also my client because I     02:44PM

work for DOC, so I have to be responsible about my responses.      02:44PM

       THE COURT:  Okay.                                    02:44PM

       DR. TAIMANGLO:  But I don't have to share          02:44PM

confidential information to the Court.  May I go on?              02:44PM

       THE COURT:  I think -- well, I think you could      02:44PM

only go on if you feel comfortable, you don't have to.  I was      02:44PM

just wondering if you were on because voluntarily you had          02:44PM

permission -- at least tell us his mental state because he did     02:44PM

1    testify, as I recall, that he was feeling quite depressed and    02:44PM

2    he was actually referred over to Guam Behavioral, and Mr. Blas    02:44PM

3    can correct me if I'm wrong, but as I recall that -- and I    02:44PM

4    assume that that was because maybe he needed some medication,    02:44PM

5    which you were going to rely on a psychiatrist to handle.    02:44PM

6              DR. TAIMANGLO:  Can you just do me a favor and    02:45PM

7    just head nod that he consents for me to talk?    02:45PM

8              THE COURT:  Well, let me ask Mr. Razzano.    02:45PM

9    Mr. Razzano will have to make that decision with him.    02:45PM

10              DR. TAIMANGLO:  All right.    02:45PM

11              MR. RAZZANO:  Well, actually, Judge, I think    02:45PM

12    Mr. Blas can decide.  I mean, he is there and it's his doctor    02:45PM

13    and if he would like to make that decision, I don't have any    02:45PM

14    problem with that.    02:45PM

15              THE COURT:  Mr. Blas?    02:45PM

16              (Pause.)    02:45PM

17              THE DEFENDANT:  Yes, Your Honor.    02:45PM

18              THE COURT:  I'm sorry, so did you -- do you    02:45PM

19    understand what she asked?  Dr. Taimanglo just wants to know    02:45PM

20    if you would consent for her to talk about your situation?    02:45PM

21    Your attorney, Mr. Razzano, says that would be up to you.    02:45PM

22              THE DEFENDANT:  No, Your Honor, I would ask that    02:45PM

23    be held in confidence with the doctor.    02:45PM

24              THE COURT:  Okay.  Very well.  Never mind, Dr. --    02:46PM

25    (echo.)    02:46PM

|    |                                                                             |        |
|----|-----------------------------------------------------------------------------|--------|
| 1  | DR. TAIMANGLO:  Thank you.                                                   | 02:46PM |
| 2  | THE COURT:  Thank you for coming though.  Okay.                              | 02:46PM |
| 3  | So anything further, Ms. Sambataro?                                          | 02:46PM |
| 4  | MS. SAMBATARO:  Well, Your Honor, we did speak --                            | 02:46PM |
| 5  | we weren't able to speak with Dr. Taimanglo yesterday but in                 | 02:46PM |
| 6  | speaking with DOC about the mental health component of things                | 02:46PM |
| 7  | -- and we won't be going into specifics with regard to                       | 02:46PM |
| 8  | Mr. Blas's case and that was not discussed, but what was                     | 02:46PM |
| 9  | discussed is that psychiatry requires a referral to behavioral              | 02:46PM |
| 10 | health and so there's often a backlog due to the availability               | 02:46PM |
| 11 | of doctors or the unavailability of doctors.  And so that's                  | 02:46PM |
| 12 | not a situation that's unique to Mr. Blas's case, that's not a               | 02:46PM |
| 13 | situation that's unique to even DOC.  It's sadly a situation                 | 02:46PM |
| 14 | that is unique to the island of Guam, and that we don't always              | 02:46PM |
| 15 | have the specialists we need for medical care, including                     | 02:46PM |
| 16 | mental health care.                                                         | 02:47PM |
| 17 | THE COURT:  Exactly.  Exactly.  Okay.  Now --                                | 02:47PM |
| 18 | DR. TAIMANGLO:  Judge Gatewood?                                             | 02:47PM |
| 19 | THE COURT:  Yes, who's speaking?                                            | 02:47PM |
| 20 | DR. TAIMANGLO:  This is Dr. Taimanglo.                                      | 02:47PM |
| 21 | THE COURT:  Yes, Dr. --                                                     | 02:47PM |
| 22 | DR. TAIMANGLO:  I don't have to speak about -- I                            | 02:47PM |
| 23 | do not have to speak about the client individually but I can                | 02:47PM |
| 24 | elaborate a little bit on the state of affairs.  Much of the                | 02:47PM |
| 25 | delay for services hinged on Guam Behavioral Health.  They had              | 02:47PM |

```
 1   lost -- one of their psychiatrists passed away, one retired.      02:47PM
 2   That left only two psychiatrists.  So although the initial        02:47PM
 3   referral is made, and as an example of the state of affairs in    02:47PM
 4   September, um, we were -- there were cancellations by Guam         02:47PM
 5   Behavioral Health, and then I followed up again with another      02:47PM
 6   referral.  And that was the one that I believe he was seeing      02:47PM
 7   her side but there were numerous cancellations, rescheduling,     02:48PM
 8   but we made a good effort to provide services for...              02:48PM
 9           THE COURT:  Yeah.  Thank you very much.  I guess          02:48PM
10   that's quite typical, especially during the crisis.  Thank you   02:48PM
11   very much.                                                        02:48PM
12           DR. TAIMANGLO:  Yes, even before that though.            02:48PM
13   This began in October.                                            02:48PM
14           THE COURT:  I see.                                        02:48PM
15           DR. TAIMANGLO:  So --                                     02:48PM
16           THE COURT:  All right.  Thank you.                        02:48PM
17           DR. TAIMANGLO:  Thank you.  And I think I'll go          02:48PM
18   ahead and sign off, if that's okay.                               02:48PM
19           THE COURT:  Thank you very much.  Have a great            02:48PM
20   day.  Be well.                                                    02:48PM
21           DR. TAIMANGLO:  Bye.                                      02:48PM
22           THE COURT:  Ms. Sambataro, anything further?             02:48PM
23           MS. SAMBATARO:  No, Your Honor, just the points          02:48PM
24   previously made.                                                  02:48PM
25           THE COURT:  Okay, so points well taken.  Let me          02:48PM
```

just -- okay.  So let me just say this:  This is what my 02:48PM
concern is.  Let's start with Mr. Blas's medical condition, 02:48PM
let's assume that I believe everything that your -- you say, 02:48PM
Ms. Sambataro, as far as what Dr. Andersen reported to you, 02:48PM
let's just assume that, and essentially, that Mr. Blas is 02:49PM
okay, he's going to be fine.  Let's assume I believe that, 02:49PM
okay, and then let's -- so that's one issue that I was looking 02:49PM
at, the second issue is the COVID-19 situation in the federal 02:49PM
detention center of Guam in Hagatna.  Obviously, we don't have 02:49PM
any COVID-19 testing results because I'm not sure if they've 02:49PM
even done any testing there, that's not clear to me yet, I've 02:49PM
not heard that, so there's no results that I can look at.  But 02:49PM
it's clear to me that Mr. Blas has a lot of factors -- I'm 02:49PM
sorry, a lot of health issues, if you will, he does have a lot 02:49PM
of health issues that make him quite vulnerable to COVID-19 if 02:49PM
COVID-19 were to infiltrate into the Hagatna detention center, 02:49PM
so that's clear to me. 02:50PM

So -- okay, but just as importantly -- and I 02:50PM
think Mr. Razzano makes a good point is what is his access to 02:50PM
his client in terms of preparing for sentencing?  Now, we have 02:50PM
-- I've gotten to look at the venue and that was good, and I 02:50PM
appreciate the United States Marshals service giving me a 02:50PM
virtual tour.  We've got to hear how it's all set up.  The one 02:50PM
thing -- and I agree with you, Ms. Sambataro, you know, our 02:50PM
federal government of -- strike that. 02:50PM

1    Our Government of Guam contractors contracted out

2  to the United States Marshals Service for our detention --

3  detainees, they are always ready, willing, and able and

4  cooperative, I mean, that's clear.  The Court has always

5  observed, specifically the two witnesses who are present, and

6  we had Major Antoine Aguon and even Lieutenant Espino and even

7  Dr. Patricia Taimanglo, all three I had met and testified in

8  the DOC settlement agreement that the was in my Court, it was

9  in our Court for over 20 years.  And recently -- it was

10  recently terminated, so I don't disagree with you that they're

11  always ready to help at -- whatever request is brought to

12  them.  But my concern really is, just listening to -- it's

13  been a complaint -- a perennial complaint that defense

14  attorneys, including Mr. Razzano, have expressed, along with

15  federal public defender John Gorman, Leilani Lujan, and Briana

16  Kottke and other CJA panel members, that they complain

17  consistently and constantly -- like persistently, if you will,

18  about their access to their clients in the facility.

19    It appears to me though that the facility -- the

20  -- that the Government of Guam is trying to update it, trying

21  to get it better.  I mean, that -- I think there's no

22  question, at least we see it, individually, we see it, you

23  hear about it, now there's an air conditioner in there.  When

24  I first heard about the pavilion or the yard, I was like okay,

25  that would be very difficult, I think, to prepare a client for

a guilty plea or for a sentencing, and so these particular 02:52PM

issues of access is being hammered through in the court system 02:52PM

more often lately through the federal public defender and now 02:52PM

through Mr. Razzano, as he is zealously and grievously trying 02:52PM

to point out that particular issue is something that the Court 02:52PM

needs to review, and so that is something that I am quite 02:53PM

concerned about. I don't see myself releasing the defendant 02:53PM

because of his medical issues because I do -- I'm going to -- 02:53PM

I'm going to believe that they're under control. I'm not 02:53PM

going to release him on the fear of COVID-19 because that 02:53PM

means I'd have to release everybody, every detainee, and I 02:53PM

just don't see that. 02:53PM

I mean, if there was -- if there is such a thing 02:53PM

as compassionate release, that judges are currently looking at 02:53PM

-- also, judges are looking at, and if there was a situation 02:53PM

where I presented with a scenario where a compassionate 02:53PM

release order should be issued, then I would consider that, 02:53PM

but my issue right now is his -- his accessibility to his 02:53PM

lawyer in the facility. I think it's been a hit and mess, 02:54PM

accessibility, and so I am kind of concerned about that. I do 02:54PM

note that Ms. Yamashita is on the line and I always like to 02:54PM

ask her if she can tell me the situation, assuming the Court 02:54PM

does allow Mr. Blas out, based on this other -- this last 02:54PM

issue, so that he can prepare for his sentencing. 02:54PM

Ms. Yamashita, what is the situation with the two 02:54PM

1    individuals here in the Court to -- Stacey Coletta and Beau    02:54PM

2    Blas?    02:54PM

3            PROBATION OFFICER:  They have been assessed, Your    02:54PM

4    Honor, to be suitable third-party custodians and the residence    02:54PM

5    as well has -- has been assessed and it meets the requirements    02:54PM

6    in the event the Court releases him on location monitoring.    02:54PM

7            THE COURT:  Okay.  Tell me who is Stacey Coletta.    02:55PM

8    I'm sorry, don't -- can you jut remind me of Ms. Coletta's    02:55PM

9    relationship with Mr. Blas and Mr. Beau Blas's relationship    02:55PM

10   with Mayor Blas?    02:55PM

11           PROBATION OFFICER:  Ms. Stacey Coletta is the    02:55PM

12   defendant's significant other and Beau Blas is the defendant's    02:55PM

13   son.    02:55PM

14           THE COURT:  Okay.  And is it -- is Ms. -- okay,    02:55PM

15   just I need to ask -- and maybe Ms. Sambataro or Ms. -- and/or    02:55PM

16   Mr. Razzano can tell me is Stacey Coletta involved in any of    02:55PM

17   the crimes being alleged -- the defendant -- wherein the    02:55PM

18   defendant is being charged with?    02:55PM

19           MR. RAZZANO:  No, Your Honor.    02:55PM

20           THE COURT:  That's you, Mr. Razzano, you just    02:55PM

21   said that?    02:55PM

22           MR. RAZZANO:  That's correct, no.  And Ms.    02:55PM

23   Sambataro agrees, I think, is what she says.    02:55PM

24           THE COURT:  You agree with that, Ms. Sambataro?    02:55PM

25           MS. SAMBATARO:  Not Ms. Coletta, no, Your Honor.    02:55PM

|   |   |   |
|---|---|---|
| 1 | THE COURT: Okay. Now, who's Beau Blas in | 02:55PM |
| 2 | relation to the defendant? | 02:55PM |
| 3 | PROBATION OFFICER: That is the defendant's son. | 02:55PM |
| 4 | THE COURT: Okay. Beau, let me -- can I see you, | 02:55PM |
| 5 | Mr. Blas? Okay. I can't -- let me look at you here. How old | 02:56PM |
| 6 | are you, Beau? I can't hear you. | 02:56PM |
| 7 | How old, sir? | 02:56PM |
| 8 | MR. B. BLAS: I am 24. | 02:56PM |
| 9 | THE COURT: And what do you do right now? | 02:56PM |
| 10 | MR. B. BLAS: Right now, I'm a waiter. | 02:56PM |
| 11 | THE COURT: Okay. So are you like on furlough? | 02:56PM |
| 12 | MR. B. BLAS: Um, yeah, I actually just started | 02:56PM |
| 13 | getting back to work this week. | 02:56PM |
| 14 | THE COURT: Okay. So you have -- okay, so -- | 02:56PM |
| 15 | okay. Thank you, sir. So what is the proposal then, that | 02:56PM |
| 16 | he's going live with the -- the girlfriend, the significant | 02:56PM |
| 17 | other, Coletta, and Blas? | 02:56PM |
| 18 | PROBATION OFFICER: Your Honor, so they reside at | 02:56PM |
| 19 | the defendant's home. And so if Your Honor grants his | 02:56PM |
| 20 | release, he could return back to his residence with restricted | 02:57PM |
| 21 | conditions that we have proposed -- the restricted conditions | 02:57PM |
| 22 | that we had proposed, to include the two third-party | 02:57PM |
| 23 | custodians. | 02:57PM |
| 24 | THE COURT: Uh-huh. Do you see them as -- hold | 02:57PM |
| 25 | on a second. I'm just getting -- let me -- | 02:57PM |

1          (Pause.)                                                    02:57PM

2          Okay.  Hold on.  I got another call in -- okay, I           02:57PM

3  have another -- I have another conference with an off-island        02:57PM

4  lawyer and a judge.  Okay.  Hold on.  Let me just tell my           02:57PM

5  staff to give me ten more minutes.  Okay.  So you are saying        02:57PM

6  that -- your suggestion is the United States probation and          02:58PM

7  pretrial office has checked out Mr. Blas's home?  They find it      02:58PM

8  suitable, they find Stacey Coletta a suitable third-party           02:58PM

9  custodian, and they find Beau Blas a suitable third-party           02:58PM

10 custodian, suitable; correct?                                       02:58PM

11         PROBATION OFFICER:  That's correct, Your Honor.             02:58PM

12 We conducted criminal record checks and nothing turned up on        02:58PM

13 either one of them.                                                 02:58PM

14         THE COURT:  Okay.  And then what are the                    02:58PM

15 conditions of release that you proposed, if the Court were to       02:58PM

16 grant it?                                                           02:58PM

17         PROBATION OFFICER:  We would propose home                   02:58PM

18 detention with location monitoring.  We would propose              02:58PM

19 third-party custodian.  Um, along with no alcohol -- no             02:58PM

20 excessive alcohol, no possession of controlled substances,         02:58PM

21 drug testing as determined by the pretrial services officer,       02:58PM

22 and that he surrender his passport.  And not obtain --             02:58PM

23         THE COURT:  I think one of the conditions that              02:58PM

24 Ms. Sambataro -- correct me if I'm wrong, Ms. Sambataro,          02:59PM

25 because it's been certainly months since we had the initial --    02:59PM

| | | |
|---|---|---|
| 1 | or second detention hearing, the second detention hearing. | 02:59PM |
| 2 | First of all, in front of me, but -- first one in front of me | 02:59PM |
| 3 | but the second one for the defendant. The first one was in | 02:59PM |
| 4 | front of Judge Manibusan but I recall that you guys were | 02:59PM |
| 5 | concerned, also, about his access to the internet; is that | 02:59PM |
| 6 | correct? Do you still feel that way if he were to be | 02:59PM |
| 7 | released? But now he's been found guilty and he's being | 02:59PM |
| 8 | sentenced. | 02:59PM |
| 9 |      MS. SAMBATARO: Well, Your Honor, I think any | 02:59PM |
| 10 | issue or concerns we would have with regard to access to | 02:59PM |
| 11 | internet would just be the ability to contact either witnesses | 02:59PM |
| 12 | in the case he's currently pending sentencing in or Mr. Blas, | 02:59PM |
| 13 | through discovery and actually reverse proffer, had also been | 02:59PM |
| 14 | privy to information regarding ongoing investigations and | 02:59PM |
| 15 | potential witness that we had talked to with regard to matters | 03:00PM |
| 16 | not currently charged, so our concern would be -- with regard | 03:00PM |
| 17 | to internet, it would just be -- just with regard to him | 03:00PM |
| 18 | reaching out to those individuals, period, because we would | 03:00PM |
| 19 | consider that an obstruction of justice. | 03:00PM |
| 20 |      THE COURT: Okay. So why don't -- | 03:00PM |
| 21 |      MR. RAZZANO: Judge, judge -- | 03:00PM |
| 22 |      THE COURT: Let me just ask you: Mr. Blas has | 03:00PM |
| 23 | now entered a guilty plea and he's prepared for sentencing. | 03:00PM |
| 24 | Do you feel that there's going to be a strong likelihood or do | 03:00PM |
| 25 | you have an opinion of whether there's a strong likelihood | 03:00PM |

*Criminal Case No. 19-00036, USA v. Blas*

1  that he's going to try to contact and intimidate any potential    03:00PM
2  witnesses in a trial?  Whether by --    03:00PM
3         MR. RAZZANO:  Judge, I'll object to the question    03:00PM
4  because there is no trial.  He's already pled guilty.    03:00PM
5         THE COURT:  I meant -- you're right.  Sorry.    03:01PM
6  Sorry.  Well, okay, so -- well, any future trial, I guess, in    03:01PM
7  case -- somebody is named, to be a -- to be tried.  A    03:01PM
8  co-conspirator, if you will -- and I'm not saying I have any    03:01PM
9  inside knowledge, I don't, but I'm saying oftentimes it    03:01PM
10 happens, so --    03:01PM
11        MR. RAZZANO:  Judge, he doesn't need to use the    03:01PM
12 internet.  We can just say he's not going to use the internet.    03:01PM
13 We don't need to get into a -- such an involved discussion,    03:01PM
14 just order that he's not allowed to use the internet.    03:01PM
15        THE COURT:  Okay.  Ms. -- that's a good point.    03:01PM
16 Ms. Sambataro, do you have any strong feelings that the    03:01PM
17 defendant will try to indirectly or directly contact any    03:01PM
18 alleged co-conspirators or witnesses in any other cases that    03:01PM
19 are affiliated with his current crime?    03:01PM
20        MS. SAMBATARO:  Yes, Your Honor.    03:01PM
21        THE COURT:  Do you --    03:02PM
22        MR. RAZZANO:  Again, Judge, I object to the form    03:02PM
23 of that question.  There are no co-conspirators and there are    03:02PM
24 no other crimes.  This man was -- pled guilty to one count of    03:02PM
25 extortion and, again, I -- I -- I respect the Court's order.    03:02PM

*Criminal Case No. 19-00036, USA v. Blas*

```
 1    I don't mean to relitigate these issues, but none of the          03:02PM
 2    things that we were told on September 25th or later in the         03:02PM
 3    second detention hearing have ever come true.  None of them.       03:02PM
 4    No one has ever been indicted, there has been no grand jury,       03:02PM
 5    there's been no search warrant.  There is no other case.  This     03:02PM
 6    is the only case, 19-36, that's all we have.                       03:02PM
 7              THE COURT:  Well, that's true, that's all you            03:02PM
 8    have currently and all -- I'm not saying -- again, I don't         03:02PM
 9    know if there's going to be anything in the future.                03:02PM
10              PROBATION OFFICER:  Your Honor --                        03:02PM
11              THE COURT:  The only reason why I see this -- let        03:02PM
12    me just say, Mr. Razzano, is to figure out the conditions of       03:03PM
13    release if I release him, that's all, and I just want to get a     03:03PM
14    feel for -- what Ms. Sambataro might feel in case I release        03:03PM
15    him.  What is it that she would want me to ensure happens          03:03PM
16    besides not release him?                                          03:03PM
17              PROBATION OFFICER:  Your Honor, if I may?                03:03PM
18              THE COURT:  Yeah.                                        03:03PM
19              PROBATION OFFICER:  There is also a condition            03:03PM
20    that I added that -- and it reads exactly as "avoid all            03:03PM
21    contact, directly or indirectly, with any person who is or may     03:03PM
22    be a victim or witness in the investigation or prosecution.        03:03PM
23    And if the -- if Your Honor identifies any concerns involving      03:03PM
24    specific individuals, we can list them in these conditions.        03:03PM
25              THE COURT:  All right.  Thank you.  That's --            03:03PM
```

1    anything -- so you -- the United States probation and pretrial          03:03PM

2    officers, are you -- office, you are recommending that the               03:03PM

3    defendant be released?                                                   03:04PM

4             PROBATION OFFICER:  Yes, Your Honor.  So we are                 03:04PM

5    not -- we are recommending that there can be conditions that             03:04PM

6    are imposed, as it relates to his risk of nonappearance, such            03:04PM

7    as risk of danger.  As it relates to his health concerns, we             03:04PM

8    would defer to Your Honor, as pretrial services is not                   03:04PM

9    qualified to, you know, evaluate those issues.                           03:04PM

10            THE COURT:  Mm-hmm.  Ms. Sambataro, is there any                03:04PM

11   other conditions of release that you would want the Court to             03:04PM

12   impose if I were to release him?  I still don't know a hundred           03:04PM

13   percent if I am.  I'll tell you this, I'm inclined to at this            03:04PM

14   point but I want to think about this a little further, at                03:04PM

15   least overnight.  But --                                                 03:04PM

16            MS. SAMBATARO:  Your Honor?                                     03:04PM

17            THE COURT:  Ms. Sambataro?                                      03:04PM

18            MS. SAMBATARO:  So -- I mean, we are opposed to                 03:04PM

19   Mr. Blas's release.  I don't need to belabor that point with            03:04PM

20   the Court for --                                                         03:04PM

21            THE COURT:  No, no, no, no.                                     03:04PM

22            MS. SAMBATARO:  And we do -- yes, we do have an                 03:04PM

23   obstruction of justice concern, we absolutely do.  And if the           03:05PM

24   Court were inclined to release him, which we very much would            03:05PM

25   disagree with, that is our biggest concern and, frankly, he is          03:05PM

         1   privy to information that -- of uncharged conduct that I won't       03:05PM

         2   go into because it's not charged but that's our biggest            03:05PM

         3   concern with his release and so a condition similar to that         03:05PM

         4   proposed by Ms. Yamashita, frankly, we wouldn't consider that       03:05PM

         5   condition but it's -- given that choice, I think that would         03:05PM

         6   have to be a bitter pill that we would be willing to swallow.       03:05PM

         7              THE COURT:  Okay, very well.  Thank you.  Okay.          03:05PM

         8   Mr. Razzano, anything further?                                     03:05PM

         9              MR. RAZZANO:  Just a comment that the information        03:05PM

        10   that he's privy to is just what he was entitled to receive in      03:05PM

        11   discovery, so it's nothing more, nothing less than that, in my     03:05PM

        12   opinion.  That's all, Your Honor.  Thank you very much.            03:05PM

        13              THE COURT:  Okay.  Are there -- so, Ms.                  03:06PM

        14   Sambataro, are there any other conditions that you would be        03:06PM

        15   able to agree upon or at least recommend to me that would          03:06PM

        16   prevent him from being a danger to the community, other than       03:06PM

        17   what I stated?                                                     03:06PM

        18              MS. SAMBATARO:  I'm sorry, Your Honor, I didn't         03:06PM

        19   hear your last comment.                                           03:06PM

        20              THE COURT:  I said other than what's already been       03:06PM

        21   proposed by U.S. Probation.                                       03:06PM

        22              MS. SAMBATARO:  Um, I mean, it's hard to propose        03:06PM

        23   a "don't obstruct justice" condition, considering that's our      03:06PM

        24   biggest concern.  Um, frankly, we don't think there is a          03:06PM

        25   condition that would mitigate that risk but that's the Court      03:06PM

```
 1    -- you know, ultimately up to the Court and not the United        03:06PM

 2    States.                                                            03:06PM

 3              THE COURT:  All right.  Let me just ask some             03:06PM

 4    questions then just so that I can feel -- so I can feel some       03:07PM

 5    measure of -- let's see, some measure of comfort, if you will.     03:07PM

 6    Let me just ask Mr. Blas:  You have been accused of a serious      03:07PM

 7    crime and the Court is concerned, just as Ms. Sambataro is         03:07PM

 8    quite concerned, that you may -- you may, um, directly or          03:07PM

 9    indirectly intimidate or contact or try to influence any          03:07PM

10    witnesses or any victims.  If the Court were to order that you     03:07PM

11    not do that, would you be able to follow that condition, that      03:07PM

12    you not have any direct or indirect contact with any witness,      03:07PM

13    any potential co-conspirator, or any alleged co-conspirator,       03:07PM

14    any victims of the crimes of which you have knowledge of, as       03:07PM

15    it relates to the crime which you're pleading guilty to?           03:08PM

16              THE DEFENDANT:  Your Honor, um, I will not even          03:08PM

17    attempt to contact any or anyone, even if they were named.        03:08PM

18    Quite honestly, I never had any interest in the very beginning     03:08PM

19    to even get in contact with these people.  I have never           03:08PM

20    threatened them in any aspect and I pled to my wrong.  I've        03:08PM

21    accepted my responsibility, and that's all.  There's nothing      03:08PM

22    more to it.  I -- I always thought that as a mayor, that one       03:08PM

23    of my primary duties is to help, and I've done so --              03:08PM

24              MR. RAZZANO:  Your Honor --                             03:08PM

25              THE DEFENDANT:  -- in my community.  The people          03:08PM
```

```
 1    --                                                              03:08PM

 2              MR. RAZZANO:  Your Honor?                             03:08PM

 3              THE COURT:  Yes?                                      03:08PM

 4              THE DEFENDANT:  -- collect enough people to -- to     03:08PM

 5    remove me from office, that kind of speaks volumes about what   03:09PM

 6    kind of help I provide my community.  I have never been --      03:09PM

 7              MR. RAZZANO:  Jesse -- Jesse.                         03:09PM

 8              THE DEFENDANT:  -- a threat to anybody.  I have a     03:09PM

 9    family.  I love my family.  I -- a lot has been taken away      03:09PM

10    from me.  I just want to recover.  I want --                   03:09PM

11              MR. RAZZANO:  Your Honor, can you hear me?           03:09PM

12              THE COURT:  Okay.  I'm sorry.  Who is speaking?      03:09PM

13              MR. RAZZANO:  This is Joe Razzano.  Can you hear     03:09PM

14    me?                                                             03:09PM

15              THE COURT:  Yes, I can now.                          03:09PM

16              MR. RAZZANO:  Okay.  Your Honor, I think he's        03:09PM

17    going too far.  All he needs to tell you is he's going to      03:09PM

18    follow the Court's order and we would submit that's the case.  03:09PM

19              THE COURT:  All right.  You heard your attorney,     03:09PM

20    Mr. Blas, okay?                                                 03:09PM

21              THE DEFENDANT:  Okay, Your Honor.                    03:09PM

22              THE COURT:  Okay.  Very well.  Okay.  Let me ask     03:09PM

23    Ms. Stacey Coletta?                                             03:09PM

24              MS. COLETTA:  Good afternoon, Your Honor.            03:10PM

25              THE COURT:  Okay.                                    03:10PM
```

| | |
|---|---|
| 1 | MS. COLETTA:  Good afternoon, Your Honor. | 03:10PM |
| 2 | THE COURT:  Ms. Coletta, good afternoon.  First | 03:10PM |
| 3 | of all, how old are you, Ms. Coletta? | 03:10PM |
| 4 | MS. COLETTA:  I'm 44 years old. | 03:10PM |
| 5 | THE COURT:  Okay.  And how long have you been the | 03:10PM |
| 6 | significant other of Mr. Blas? | 03:10PM |
| 7 | MS. COLETTA:  About 15 months. | 03:10PM |
| 8 | THE COURT:  15 months? | 03:10PM |
| 9 | MS. COLETTA:  Mm-hmm. | 03:10PM |
| 10 | THE COURT:  How long has he been in prison?  How | 03:10PM |
| 11 | long has he been in detention, do you know? | 03:10PM |
| 12 | MS. COLETTA:  Nine months.  He just started his | 03:10PM |
| 13 | nine-month -- he's been in jail for 246 days today. | 03:10PM |
| 14 | THE COURT:  So you just started going out with | 03:10PM |
| 15 | him right before he was detained then, six months before? | 03:10PM |
| 16 | MS. COLETTA:  Yes, just about. | 03:10PM |
| 17 | THE COURT:  Okay, I see.  And how well did you | 03:10PM |
| 18 | know him before that? | 03:10PM |
| 19 | MS. COLETTA:  We were professional acquaintances | 03:10PM |
| 20 | before that.  I've known him for several years, maybe about | 03:10PM |
| 21 | four. | 03:10PM |
| 22 | THE COURT:  Okay.  When you say "professional | 03:10PM |
| 23 | acquaintances", what does that mean? | 03:10PM |
| 24 | MS. COLETTA:  He is the mayor of our village.  I | 03:10PM |
| 25 | was the former administrator at Southern High School, and also | 03:10PM |

*Criminal Case No. 19-00036, USA v. Blas*

1   Jose Rios Middle School where he was doing partner business                  03:11PM

2   with my internship.                                                          03:11PM

3           THE COURT:  He was doing what kind of business?                      03:11PM

4   I'm sorry.                                                                    03:11PM

5           MS. COLETTA:  He was doing some um, community                        03:11PM

6   work with the schools that I worked at.                                      03:11PM

7           THE COURT:  Oh, I see.  Okay.  And that's how you                    03:11PM

8   know Mr. Blas -- the former mayor?                                           03:11PM

9           MS. COLETTA:  Yes, ma'am.                                            03:11PM

10          THE COURT:  Okay.  And you are -- are you                            03:11PM

11  confident that you could control him if he's in your custody?                03:11PM

12          MS. COLETTA:  Yes, I am, Your Honor.                                 03:11PM

13          THE COURT:  I mean, I think our pretrial officers                    03:11PM

14  think -- at least they believe that you can.  I just want to                 03:11PM

15  see if you are -- are you sure that you can?                                 03:11PM

16          MS. COLETTA:  Yes, Your Honor, I am sure.                            03:11PM

17          THE COURT:  And if he were to violate any of the                     03:11PM

18  conditions -- for example, if he were to try to intimidate any              03:11PM

19  witness, potential witness, or potential co-conspirator or                   03:11PM

20  victim, would you immediately call the United States probation              03:11PM

21  officer to have him arrested for violating a Court order?                    03:11PM

22          MS. COLETTA:  Yes, Your Honor.                                       03:12PM

23          THE COURT:  I mean, if you're a third-party                          03:12PM

24  custodian, you're going to have to make sure he follows these               03:12PM

25  conditions religiously, you understand that; right?                         03:12PM

1          MS. COLETTA:  Yes, Your Honor.  I understand.          03:12PM

2          THE COURT:  And failure to do that would result          03:12PM

3    in you being held in contempt of Court.          03:12PM

4          MS. COLETTA:  I understand that, Your Honor.          03:12PM

5          THE COURT:  You're willing to take that risk?          03:12PM

6          MS. COLETTA:  I have full confidence, Your Honor,          03:12PM

7    that Jesse is going to comply, and I know that I'm the kind of          03:12PM

8    person that if anything is wrong, I'm going to report it to          03:12PM

9    the appropriate authorities immediately.          03:12PM

10          THE COURT:  Okay.  And so are you currently          03:12PM

11    living at his house now?          03:12PM

12          MS. COLETTA:  Yes, Your Honor.          03:12PM

13          THE COURT:  And Beau Blas, his 24-year-old son,          03:12PM

14    is also staying at the home?          03:12PM

15          MS. COLETTA:  Yes, he is, Your Honor.          03:12PM

16          THE COURT:  And U.S. Probation, you have agreed          03:12PM

17    that they could be co-third-party custodians; is that correct?          03:12PM

18          PROBATION OFFICER:  That's correct, Your Honor.          03:12PM

19    It's been relayed to me that due to their work schedules, one          03:12PM

20    would always be in the home or with the defendant.  That's my          03:13PM

21    understanding.  Is that correct, Ms. Coletta?          03:13PM

22          MS. COLETTA:  That's correct, Ms. Yamashita.          03:13PM

23          THE COURT:  All right.  May I speak to Mr. Blas          03:13PM

24    then, Beau Blas, if you can zoom in onto your camera there.          03:13PM

25    Mr. Blas, my question to you is:  If you are approved as a          03:13PM

1   third-party custodian by this Court, based on the                    03:13PM

2   recommendation of U.S. probation and pretrial, do you feel           03:13PM

3   confident that you can control your father in terms of making         03:13PM

4   sure he follows the conditions of release by the Court?              03:13PM

5               MR. B. BLAS:  Absolutely.                                 03:13PM

6               THE COURT:  Okay.  If your father was to start            03:13PM

7   drinking or your father was to start taking methamphetamine or       03:13PM

8   getting on the internet and those were all violations of his         03:13PM

9   conditions, would you immediately call the United States             03:13PM

10  probation office for them to arrest him?                             03:14PM

11              MR. B. BLAS:  Immediately.                               03:14PM

12              THE COURT:  Okay.  You have no hesitation about          03:14PM

13  that?                                                                03:14PM

14              MR. B. BLAS:  None whatsoever.                           03:14PM

15              THE COURT:  Anybody have any questions?  Ms.             03:14PM

16  Sambataro?                                                           03:14PM

17              (Pause.)                                                 03:14PM

18              MS. SAMBATARO:  No, Your Honor.                          03:14PM

19              THE COURT:  Okay.  Let me just say, Mr. Blas,            03:14PM

20  just as I asked Ms. Coletta, if you don't report any of your         03:14PM

21  father's violations, you two could be held in contempt because       03:14PM

22  you're taking custody, third-party custody of your father.  Do       03:14PM

23  you understand that?                                                 03:14PM

24              MR. B. BLAS:  I understand totally.                      03:14PM

25              THE COURT:  It's possible you could go to jail if        03:14PM

*Criminal Case No. 19-00036, USA v. Blas*

1    your dad screws up and you don't report his screw up.                    03:14PM

2                   MR. B. BLAS:  I understand.                               03:14PM

3                   THE COURT:  You still want to take that risk,             03:14PM

4    sir?                                                                     03:14PM

5                   MR. B. BLAS:  Yes.                                        03:14PM

6                   THE COURT:  Okay.  Okay, if there's nothing --            03:14PM

7    anything further then, Mr. -- or let me see, Ms. Yamashita, do           03:15PM

8    you have anything further you'd like to report before we                03:15PM

9    recess?                                                                  03:15PM

10                  PROBATION OFFICER:  Um, no, Your Honor.  Thank            03:15PM

11   you.                                                                     03:15PM

12                  THE COURT:  Okay.  Mr. Razzano, anything further?         03:15PM

13                  MR. RAZZANO:  Nothing further, Your Honor.  Thank         03:15PM

14   you very much.                                                           03:15PM

15                  THE COURT:  Ms. Sambataro?                                03:15PM

16                  MS. SAMBATARO:  No, Your Honor.                           03:15PM

17                  THE COURT:  Okay.  Let me -- let me just think            03:15PM

18   about it tonight what I'm going do, and I will issue a                   03:15PM

19   decision tomorrow, okay?  Tomorrow morning.                             03:15PM

20                  MR. RAZZANO:  Thank you, Your Honor.                      03:15PM

21                  THE COURT:  And I would like to, first of all             03:15PM

22   thank Janet Yamashita for getting all of this together, Tanya           03:15PM

23   Muna, and the U.S. Marshals for helping us, even the                    03:15PM

24   Department of Corrections officers, I really appreciate them            03:15PM

25   giving us a tour and answering questions and, also -- and               03:15PM

thank you, Mr. Razzano and Ms. Sambataro and Mr. Schwab, for    03:15PM

your appearance here today.    03:15PM

        Mr. Blas, I will say to you that if I were to    03:16PM

release you, you better not screw -- I rarely release people.    03:16PM

If I release you, it would be for a good reason but you better    03:16PM

not burn me, Mr. Blas, if I do that because this is an    03:16PM

important case to the United States government, to the    03:16PM

community, and to yourself, but if I were to release you    03:16PM

because --    03:16PM

        THE DEFENDANT:  I promise, Your Honor, I --    03:16PM

        THE COURT:  Go ahead.    03:16PM

        THE DEFENDANT:  She's talking.    03:16PM

        THE COURT:  Go ahead.    03:16PM

        THE DEFENDANT:  I promise, Your Honor, I would    03:16PM

follow all the orders of the Court.    03:16PM

        THE COURT:  All right.  Well -- okay.  Well,    03:16PM

we'll see about that.  Let me think about it.  Let me look at    03:16PM

the -- let me just look at how I'm going to resolve this issue    03:16PM

but I appreciate everybody being prepared.  Have a nice    03:16PM

evening, everyone.  Take care.    03:16PM

        MR. RAZZANO:  Thank you, Your Honor.    03:16PM

        MS. SAMBATARO:  Your Honor, thank you.    03:16PM

        THE COURT:  Bye, bye.    03:16PM

        (Proceedings concluded at 3:16 p.m.)    03:16PM

                  * * *

CERTIFICATE OF OFFICIAL REPORTER

CITY OF HAGATNA        )
                       )  ss.
TERRITORY OF GUAM      )


          I, Veronica F. Flores, Official Court Reporter for
the United States District Court of Guam, do hereby certify
the foregoing pages, 1 to 69, to be a true and correct
transcript of the proceedings held in the above-entitled
matter to the best of my ability.

          Dated this 16th day of June 2020.


                              /s/Veronica F. Flores
                              Veronica F. Flores